STATE OF WEST VIRGINIA

*v.*

WILLIAM HAWKINS, III

(No. 14960)

Decided July 13, 1981.

*James B. McIntyre, William H. Hazlett* for appellant.

*James E. Roark,* Prosecuting Attorney, *Frances W. McCoy,* Assistant Prosecuting Attorney, for appellee.

NEELY, JUSTICE:

Appellant, William Hawkins, was convicted in the Circuit Court of Kanawha County of first-degree murder. The jury found him guilty of bludgeoning a twenty-year-old woman to death with a hand iron. An understanding of appellant's assignments of error requires a fairly detailed recitation of the facts.

At approximately 9:30 p.m. on 9 September 1978 an off-duty room clerk discovered the battered and dead body of the victim in a vacant room on the third floor of the Worthy Hotel in Charleston. Responding to the clerk's call, Police Officers Roy Bailey and Howard Haynes arrived to find the partially clothed body of the deceased wrapped in a sheet and lying partly on a bed with her legs on the floor. The officers checked the body for vital signs and found none. The wounds were such that the officers could not determine whether the body were male or female. A detective, a police photographer, and paramedics soon arrived. The paramedics confirmed that the body was dead and removed the body to a stretcher, at which time it was determined that the victim was female and without identification. The Police did find a key ring from the Holley Hotel on the body with which they soon determined that the deceased was one Diane Engman, a young woman who had arrived in town two days before to work as a dancer at the Intimate Lounge.

Further investigation led the police to one Fleming Gunnoe, an employee of the Intimate Lounge and an acquaintance of the victim. Gunnoe made an identification of the body at the Medical Examiner's office in South Charleston.

On the night of 10 September 1978, officers Bailey and Haynes, while working the same shift and beat as they had the previous evening, were approached by a street character named Bill Dunn, who was known to live by sorting through trash cans. Dunn handed the officers a manila envelope containing a Michigan driver's license and other identification belonging to Diane Engman. Recognizing the photograph on the driver's license to be that of the dead female victim the officers had found the night before, they proceeded immediately to the trash barrels in which Dunn had found the items. In the trash barrels they found a bloody yellowish-gold jump suit, green and gold sequins, bloody jockey underwear, a bloody sheet, an iron and pieces of bakelite, a hospital identification bracelet with the name "William Hawkins" on it, a belt buckle inscribed "Hawk" and a bloody brown and white polka dot, striped pillowcase. This evidence was gathered by Detective Patrick Legg and turned over to the Criminal Investigation Bureau. Blood and hair found in and on the various items from the trash cans matched that of the victim. The iron was quickly determined to have been the murder weapon on the basis of the shape of the wounds on the victim's head.

On the morning of 11 September 1978, Detective Dallas Staples took a statement from Fleming Gunnoe concerning his knowledge of the victim's final hours. Gunnoe gave the officer a description of a young black male in a yellow jump suit accompanying the victim a few hours before the discovery of the victim's body. Gunnoe also stated that he had spent the night before the murder with the victim in her hotel room.

That afternoon the detectives gathered at the Charleston Police Department to compare notes. Detective Harvey Bush had received a tip from a source that one William Hawkins had information concerning the death of Diane Engman. The informant had also related to Bush that Hawkins had admitted killing someone. Thereupon Detectives Staples, Legg, and Bush proceeded to the Worthy Hotel, arriving shortly after 2:30 p.m. on 11 September 1978. Finding that William Hawkins was a resident of the

hotel, the three officers and the desk clerk went to Room 224, the room registered to Hawkins. The three officers testified that after knocking on the door, the clerk quickly unlocked and opened it while stating "maybe he is asleep." In the few seconds that the door was open Detectives Legg and Staples saw a brown and white polka dot pillowcase similar to the blood soaked-one found in the trash barrels the night before, a shiny green sequin similar to those found in the trash can and on the body of the deceased, a smear on the floor that looked like something had been wiped up, and what appeared to be marijuana. The room clerk then shut the door and accompanied two of the officers down to the lobby. Detective Bush remained in the hallway to secure the room. From the lobby the two officers called to get a search warrant for Room 224 and requested that the Medical Examiner come to the Worthy Hotel.

At approximately 3:30 p.m. while the police were waiting for the search warrant to arrive, the defendant entered the Worthy Hotel lobby. The officers promptly arrested him for murder. Detective Legg read the appellant his *Miranda* rights and his rights to privacy, and then asked for permission to search his room. The defendant indicated that he understood these rights and verbally consented to the search of his room. However, the officers delayed the search until the appellant signed a written "consent to search" form which was being sent from the police headquarters.[1] When it arrived the officers explained the "consent to search" form to the appellant, who stated that he understood it. Before he signed it he requested to speak with Mr. Peter C. Brown, Assistant Prosecuting Attorney of Kanawha County, who had been called to the scene by the officers. In the presence of Mr. Brown an officer again read the *Miranda* rights to the appellant. After a short discussion with Mr. Brown, the appellant again stated that he understood his rights, and he then signed the "consent to search" form in the presence of Detective Legg and Mr. Brown.

---

[1] The "consent to search form" contains an explication of rights along with a consent statement which a suspect may sign.

At the preliminary hearing on 24 November 1978, Fleming Gunnoe identified the appellant as being the man he had seen in the company of the deceased at about 4:00 p.m. on 9 September 1978. There were only two black males other than the appellant at the hearing. One was the appellant's father and the other was known by Gunnoe to be a police detective. At trial Gunnoe again identified the appellant and testified that he had seen the appellant only on the afternoon of the murder and at the preliminary hearing.

On 6 June 1979 during the luncheon recess of the suppression hearing the trial court judge officiated at Detective Legg's wedding held in the courtroom. That afternoon the court denied the appellant's motion to suppress evidence taken from the appellant's hotel room and granted the appellant's motion to suppress evidence which showed that hair samples from the appellant matched those found on the victim's body. The next morning the appellant moved for recusal citing the impropriety of the trial court's conducting the marriage ceremony.[2] The trial court denied the motion.

During the trial the appellant defended himself by introducing alibi testimony for the afternoon and evening. Appellant maintained that he then had gone back to his room, found the body, and in a state of panic carried it upstairs to a vacant room. He claimed that he had given his room key to an acquaintance who had worn the appellant's gold jump suit that afternoon. The appellant admitted that he had in fact put the bloodstained objects in the trash cans where they were discovered.

In response to the alibi defense, the State introduced evidence that the appellant had gone to a friend's house after the murder and told the friend that he needed an alibi from 6:00 p.m. on. However, the trial court refused to admit Gunnoe's testimony that the victim had told him in the

---

[2] This was the appellant's second motion for recusal. The first asserted, among other counts, that the trial court was prejudiced against black defendants. It too was denied, and appellant has not assigned error to that denial.

presence of the appellant that she would be meeting the appellant at 6:00 p.m. During closing argument, the prosecutor stated:

> ... But you will recall that he said he stood on the street, he had a conversation with the victim, she can't tell us what it is, obviously; Fleming Gunnoe did not testify to what it was. Mr. Hawkins was present. I submit to you that in that conversation with the victim, if Mr. Gunnoe could testify, therein lies the reason that William Hawkins knew he needed an alibi for six o'clock. (R. 1581).

On 27 June 1979 the jury returned a verdict finding the appellant guilty of murder in the first-degree with recommendation of mercy. After polling the jury, the court had the appellant taken to the Grand Jury room for a few moments. The court then thanked the jury for its attention during the four-week trial and complimented the attorneys for both sides for their excellent representation. The defendant was then brought back into the courtroom where the trial court accepted the jury verdict and excused the jury from further duties in this matter.

On these facts the appellant has assigned five errors. The appellant maintains, first, that all evidence taken from his hotel room was inadmissable since it was the "fruit" of an illegal search; second, that Gunnoe's in-court identification was inadmissible because it was based upon an impermissibly suggestive pretrial identification; third, that the trial court should have recused himself after conducting the marriage of one of the State's key witnesses; fourth, that the Prosecuting Attorney should not have suggested the contents of evidence previously excluded by the trial court; and fifth, that the appellant should not have been taken from the courtroom while the court addressed the jury.[3]

---

[3] Appellant also assigned as error the fact his preliminary hearing did not take place until 24 November 1978. Since the record clearly demonstrates that this delay was caused by the appellant's frequent requests to change counsel, we see no need to address this issue further.

## I. EVIDENCE FROM THE APPELLANT'S HOTEL ROOM

The appellant contends that the admission of the evidence taken from his room was reversible error. He argues that this evidence was inadmissible as "fruit of the poisonous tree," since it was seized after the police had taken an allegedly illegal view of the room. We disagree. We find that the evidence was taken as a result of a valid consent search which followed a valid arrest. Therefore, regardless of whether the view into the room was constitutional, the evidence was admissible because it was seized on the basis of competent information gained independently from the questionably illegal police conduct.[4]

It has long been the rule in West Virginia and other states that police officers may make warrantless felony arrests in public places upon probable cause to believe that the arrested person has committed a felony. *State v. Craft*, 165 W. Va. 741, 272 S.E.2d 46, 54 (1980). This rule is consistent with the standard set out in *United States v. Watson*, 423 U.S. 411 (1976). In *Watson* the United States Supreme Court discussed the history of warrantless felony arrests at length and concluded that such arrests may be made in public places upon probable cause and nothing more. The Court justified its holding by noting that:

> ... the judgment of the Nation and Congress has ... been to authorize warrantless public arrests on probable cause rather than to encumber criminal prosecutions with endlesss litigation with respect to the existence of exigent circumstances, whether it was practicable to get a warrant, whether the suspect was about to flee, and the like. *Id.* at 423-24.

---

[4] Appellant introduced substantial evidence that the police officers enjoyed far more than a casual and unintentional view of appellant's room. Our overall life experience leads us to accept, at least *arguendo*, appellant's characterization of what occurred. Nevertheless, even assuming a thorough illegal search, there was other, overwhelming evidence of appellant's participation in the crime which would have led the police to make a legal, warrantless arrest.

Where warrantless felony arrests are made, the Supreme Court has held that the Fourth Amendment requires that, before a person can be subjected to any significant pretrial restraint, a judicial determination of probable cause must be made either before or promptly after the arrest. In *Gerstein v. Pugh*, 420 U.S. 103 (1975), the Court recognized the necessity of allowing warrantless arrests based on probable cause, but went on to state that "once a suspect is in custody, however, the reasons that justify dispensing with the magistrate's neutral judgment evaporate." *Id.* at 114. The Court reasoned that:

> [W]hile the state's reasons for summary action subside, the suspect's need for a neutral determination of probable cause increases significantly. The consequences of prolonged detention may be more serious than the interference occasioned by arrest. Pretrial confinement may imperil the suspect's job, interrupt his source of income, and impair his family's relationship . . . when the stakes are this high, detached judgment of a neutral magistrate is essential if the Fourth Amendment is to furnish meaningful protection from unfounded interference with liberty.
> *Id.*

In this case there was probable cause for the warrantless arrest in a public place and the appellant was given a prompt hearing by a magistrate. At the time of the arrest in front of the Worthy Hotel, the police knew that Hawkins' identification bracelet and personalized belt buckle had been found in the trash cans intermingled with the victim's identification, the bloodstained sheets and clothing, and the murder weapon. They knew that Hawkins lived in the same hotel in which the murder took place, and they had heard from an informant that Hawkins said that he had killed somebody. The police knew all this before the illegal view into the appellant's hotel room. We hold that on these facts the police had probable cause to arrest the appellant even without the added information they obtained from the view into his room. Kanawha County magistrate Jack Kinder confirmed the finding of probable cause later that same day.

Following the arrest, the appellant signed a "consent to search" form. Before he signed it, the police read him the *Miranda* rights twice. The police also read the "consent to search" rights to him and went over the "consent to search" form with him. At no point did the police try to pressure the appellant into signing the form by saying either that they had looked into his room already or that they were getting a search warrant anyway. From the circumstances of this case it is clear that the appellant's consent to search was freely and voluntarily given.[5] *See State v. Williams*, 162 W.Va. 309, 249 S.E.2d 758 (1978). Hence the seizure of the evidence followed a valid arrest and a valid search.

Since we have determined that the arrest and the consent search both took place on the basis of information other than that gathered during the view into the hotel room, the evidence subsequently taken from the room was admissible regardless of whether the view by the police were constitutional. There are three generally recognized exceptions to the exclusionary rule: (1) where evidence sought to be introduced has an independent source, (2) where the evidence would inevitably have been discovered, and (3) where the connection between the unconstitutional police conduct and the discovery of the evidence is so attenuated as to remove any taint of the original illegality. *See United States v. Crews*, 445 U.S. 463, 470 (1980). In this case the challenged evidence was seized during the execution of a valid consent search. Therefore, even if we were to assume, without so deciding, that the view of the room were illegal, we would still hold that the evidence was admissible because its seizure came about from a source independent of the police conduct.

---

[5] The appellant, who has a B.A. in Communications and who has done some graduate work, claims to have taken several courses in law-related subjects including law enforcement and constitutional law. The trial court found the appellant to posses more knowledge of law than the average layman and permitted the appellant to act as his own co-counsel.

## II. THE PRETRIAL IDENTIFICATION

Appellant next argues that Fleming Gunnoe's in-court identification of the appellant as being the man Gunnoe saw with the victim shortly before her murder was inadmissible because that identification was based on an impermissibly suggestive pretrial identification. This court has adopted a test for admissibility of such identification based on *Neil v. Biggers*, 409 U.S. 188 (1972):

> In determining whether an out-of-court identification of a defendant is so tainted as to require suppression of an in-court identification a court must look to the totality of the circumstances and determine whether the identification was reliable, even though the confrontation procedure was suggestive, with due regard given to such factors as the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation. Syl. pt. 3, *State v. Casdorph*, 159 W.Va. 909, 230 S.E.2d 476 (1976).

Though this test has been fashioned for witnesses of a crime, it is also applicable to the witness in this case who saw the appellant with the victim shortly before her murder. The witness, Fleming Gunnoe, was able to view the appellant in broad daylight while the appellant walked with the victim across the street and during the short conversation the witness had with the victim. During this conversation the appellant was standing within just a few feet of the witness at all times. Given his intimate relationship with the victim, it can be assumed that the witness paid close attention to the victim's male companion, the appellant, during the encounter. The witness was able to give an accurate description by telling the police that the appellant had worn the yellow jump suit later found stained with blood in the trash can. He was also able to describe the appellant's approximate height and facial characteristics. In spite of rigorous cross-examination at trial Gunnoe maintained his certainty that it was the

appellant he had seen with the victim. In light of these circumstances we find that Gunnoe's identification was reliable.

Having found that the identification was reliable we must now balance that reliability against any impermissibly suggestive procedures used in the pretrial identification. *Mason v. Brathwaite,* 432 U.S. 98, (1977); *State v. McNeal,* 162 W. Va. 550, 251 S.E.2d 484 (1979). While we agree with the appellant that a line-up or photo identification would have been less suggestive than the identification at the preliminary hearing, we do not find that the shortcomings of that particular identification outweigh the factors contributing to its reliability. Recognizing that "reliability is the linchpin in determining the admissibility of identification testimony," *Manson v. Brathwaite, supra* at 114, we conclude that Gunnoe's in-court identification was admissible.

### III. RECUSAL

The appellant based his second motion for recusal on the fact that the trial court judge conducted a wedding ceremony for one of the State's witnesses during a luncheon recess of the suppression hearing. In affirming the denial of this motion we note that no jurors were present to infer any bias by the judge. The judge performed the wedding in open court and not in chambers as is often done. The trial court knew the bridegroom, Detective Legg, only through the detective's periodic appearances as a witness in cases before the judge. As was developed during the hearing on the motion, it is clear that the judge performed the ceremony more out of the duty of his office than out of any personal friendship with the detective. Nevertheless, we cannot condone as an act in good taste the judge's participation in the wedding of a witness in a case before him because of the aspersions it appears to cast on his impartiality. We must always remember that we are seeking not only justice but the appearance of justice as well. However, we do not hold that this occurrence constitutes reversible error in this case.

## IV. COMMENTS OF THE PROSECUTOR ON MATTERS NOT IN EVIDENCE

The appellant contends that the comments by the prosecutor concerning the possible contents of excluded testimony constitute reversible error. We agree with the appellant that the prosecutor's remarks were improper. Though the State argues that the prosecutor's comments suggested merely the possible inferences from various pieces of evidence, we find that the prosecutor crossed the boundary of permissible conduct. He implied the contents of a conversation between the victim and Gunnoe which had been specifically excluded by the Court. However, we do not find that the prosecutor's comments constituted reversible error in this case.

We observe with interest that the appellant did not object at the time of the prosecutor's comments. Either appellant's counsel thought that the prosecutor's comments were innocuous given the length of the prosecutor's argument, the obtuse nature of the reference, and the jury's collective somnolence; or he thought that an objection followed by a corrective instruction from the bench would merely cause the jury to dwell on the subject. If he thought it proper trial tactics not to object then we defer to his judgment made as it was on the basis of firsthand observation of the impact of the prosecutor's words. We are loath to reverse for an error to which no objection was made. This is not to say that an appellant may never bring an unobjected to error before this Court. However, by looking at the nature of the prosecutor's comments in this case, we do not find grounds for reversal.

In *State v. Cutlip*, 131 W. Va. 141, 46 S.E.2d 454 (1948), this Court upheld a conviction even though a prosecutor gave the full and exact contents of excluded testimony in his closing argument. In *Cutlip* the trial court excluded testimony to the effect that one of the defendants had agreed to plead guilty so that the other defendants could be acquitted. In the closing argument the prosecutor stated that one of the defendants had pleaded guilty for that very purpose. While not condoning the prosecutor's conduct, this Court held that no real prejudice had resulted from the

trial court's overruling the defendant's objection to the argument. In this case we do not feel that the prosecutor's breach was as great as it was in *Cutlip*. The prosecutor's comments did not give the explicit details of the excluded testimony. If anything, the comments served to focus the jury's attention on the appellant's inculpatory request for an alibi, which was admitted into evidence, rather than on the excluded contents of the conversation. Moreover we find that, as in *Cutlip*, there was overwhelming evidence against the appellant. This plus the fact that the defense attorney saw no reason to object at the time leads us to conclude that the prosecutor's argument did not prejudice the appellant in any substantial way. Hence there was no reversible error. *See State v. Atkins*, 163 W.Va. 502, 261 S.E.2d 55 (1979).

## V. APPELLANT'S ABSENCE DURING PROCEEDINGS.

The trial court's removal of the appellant from the courtroom after the return of the verdict and the polling of the jury but before the acceptance of the verdict by the court and the discharge of the jury was ill-advised. However, it was far short of reversible error. Under West Virginia law an accused must be present at all critical stages of criminal proceedings. *State v. Boyd*, 160 W. Va. 234, 233 S.E.2d 710 (1977). When a defendant is not present at a critical stage, the State has the burden of proving beyond a reasonable doubt that "what transpired in his absence was harmless." *Id.*, at syl. pt. 6. Both the State and the appellant agree that the only thing which happened in the appellant's absence was that the trial court thanked the jury for its service and complimented the performance of counsel on both sides. Hence, while we agree with the statement in the State's Brief that "the trial court undoubtedly did not use the preferred procedure," we find that the action of the trial court was harmless beyond a reasonable doubt and, therefore, did not constitute reversible error.

Accordingly, for the reasons set forth above the judgment of the Circuit Court of Kanawha County is affirmed.

*Affirmed*