304 S.E.2d 671

**STATE of West Virginia**

v.

**Clyde Daniel ALDRIDGE.**

**No. 15600.**

Supreme Court of Appeals of West Virginia.

June 23, 1983.

alive about two hours earlier. Medical testimony established that he died at about 8:00 p.m. from multiple stab wounds, and state police investigators found blood both inside and outside Burgess' house and took samples for analyses.

Aldridge, then a juvenile approaching his sixteenth birthday, was seen with three or four other young men at the victim's residence in the late afternoon on the day of the killing, and was sought for questioning.

At trial two state troopers were asked on direct examination about having seen Aldridge the day after the killing, walking along State Route 17 at Blair. Trooper G.A. Ables, in charge of the investigation, testified that when they recognized Aldridge, they stopped their police car, told him they wanted to ask him some questions, and requested that he be seated in the back of their car. Trooper Ables noted that the temperature was about sixty degrees that afternoon and that Aldridge was wearing gloves. One of the troopers asked him to remove them, he did, and the officers saw a laceration on his right hand. They then drove him to a point near his home and released him. Aldridge had also been seen by other people, in public, with an injured hand.

He was not arrested until after Trooper Ables was informed by one Daniel Lee Wilson on March 5, 1979, that he had seen a cut on one of the fingers of Aldridge's right hand two days after the crime, and that Aldridge had at that time admitted killing Burgess. Aldridge was charged the next day.

John R. Mitchell, Charleston, for appellant.

Janet F. Steele, Asst. Atty. Gen., Charleston, for appellee.

HARSHBARGER, Justice:

Clyde Daniel Aldridge appeals from a second-degree murder conviction after a second trial in the Circuit Court of Logan County. He was convicted on July 15, 1981 of the February 18, 1979 murder of Brady Burgess, a bootlegger, who conducted business from his residence at Blair, Logan County. Burgess, who was found dead inside his house by a prospective customer at approximately 8:30 p.m., had been seen

The defense objected to the trooper's testimony about the hand wound, but after an *in camera* hearing, the trial judge ruled that if there was any error in the admission of this testimony, it had already been committed, and refused to instruct the jury to disregard the trooper's observations.[1]

---

**1.** Trooper Ables testified on direct examination as follows:

"Q. Did you have occasion to talk with Clyde Daniel Aldridge that day?

"A. Yes, sir.

"Q. And where did you talk to him?

"A. In the back of a State Police car.

"Q. At the time you talked to him, did you notice anything unusual about him?

"A. I noticed he had gloves on.

"Q. Why would you consider that unusual?

"A. It was approximately 60 degrees that day. It was a warmer day than it had been.

On February 22, 1979, Trooper Ables was informed by the department's chemist that the blood found outside the victim's home was a different type than that found inside. Ables and an assistant prosecutor appeared before the circuit court judge later that day, advised him of the foregoing information, and the judge issued an order authorizing a blood sample to be taken from Aldridge at a nearby hospital, which was done. No affidavit was presented to the judge, and the court order does not affirmatively show that the prosecutor and trooper were under oath. That blood sample was analyzed, but was not introduced at Aldridge's trial.

The defense did not dispute the existence of the hand wound, and introduced evidence that Aldridge cut his hand on a piece of tin while working on a cattle pen at his parent's residence the day before the homicide.

Following the first trial that resulted in a hung jury, a second blood sample was taken from Aldridge on August 23, 1979, upon a search warrant issued by a local magistrate. The blood test results from the second sample were introduced at the second trial, and the State's chemist testified that the blood found outside the victim's home was consistent with Aldridge's blood type, a type found in only 2.2 percent of the general population.

> "Q. And did you notice anything unusual about his hands?
> "A. On one hand, on the right hand was a large cut.
> "Q. Could you use your own hand to demonstrate to the jury where this cut would have been located on Clyde Daniel Aldridge's hand?
> "A. Through this area. [Indicating.]
> "MR. MITCHELL: Objection, Your Honor ...."

2. The Fourth Amendment of the United States Constitution and Article III, Section 6 of our Constitution provide that no warrant shall issue except upon probable cause, supported by oath or affirmation.

3. In *Schmerber,* the Supreme Court ruled that blood samples are subject to Fourth Amendment scrutiny. As in most reported blood test cases, the blood sample in *Schmerber* was taken to determine the alcohol content of the blood as a means of establishing intoxication. Because

Aldridge moved to suppress any evidence resulting from the second test, contending that the court order authorizing the first blood sample was invalid because it was not supported by evidence given under oath or affirmation, and that this illegality made the test results on the second blood sample inadmissible "fruit of the poisonous tree".[2] Following a pretrial hearing, the trial court overruled his motion to suppress, relying on *Schmerber v. California,* 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966).[3]

Aldridge's primary argument is that he was subjected to an unconstitutional nonconsensual search when he was required to remove his gloves, *see, e.g., State v. Williams,* W.Va., 249 S.E.2d 758 (1978); *State v. Thomas,* 157 W.Va. 640, 203 S.E.2d 445 (1974), and that the officers' testimony about seeing the wound was therefore inadmissible. He also contends this illegal search tainted subsequent blood tests.

There was no contention either prior to trial, at trial, or in Aldridge's motion for a new trial that the blood testing evidence was tainted by the police officers' observation of Aldridge's hand. The thrust of the argument below went to a claimed *Miranda* violation.[4]

In *State v. Peacher,* 167 W.Va. 540, 280 S.E.2d 559, 575 (1981), we recognized that "Fourth Amendment jurisprudence is not a well-settled area of immutable rules ...."

the alcohol level in human blood diminishes rapidly after ingestion of alcohol ceases, the Supreme Court carved out an exception to the warrant requirement because the time necessary to secure a warrant from a magistrate could lead to dissipation of the highly evanescent evidence. Obviously, no such emergency is present where blood typing is the object of the search and seizure. Blood types do not change from hour to hour.

Justice Brennan wrote for the Court that "the Fourth Amendment's proper function is to constrain, not against all [government] intrusions as such, but against intrusions which are not justified in the circumstances, or which are made in an improper manner." 384 U.S. at 768, 86 S.Ct. at 1834, 16 L.Ed.2d 918.

4. There was no assertion that Aldridge was illegally seized. *See, e.g., State v. Stanley,* 168 W.Va. 294, 284 S.E.2d 367 (1981); *State v. Boswell,* 170 W.Va. 433, 294 S.E.2d 287 (1982).

Theoretical and analytical difficulties are often present in this frequently litigated, rapidly changing area of constitutional law. Even so, we are convinced that no unreasonable search occurred here.

In *State v. Boswell,* 170 W.Va. 433, 294 S.E.2d 287 (1982), we discussed whether a police officer had impermissibly seized a defendant by tapping on the window of a van and asking for identification. We concluded that the facts within the officer's knowledge were sufficiently suspicious to warrant the inquiry, and that such inquiry was so minimally intensive that the defendant was not seized.

Our analysis in *Boswell* relied heavily on a line of decisions by the United States Supreme Court beginning with *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). The significance of *Terry,* for present purposes, is the Court's recognition that certain limited "seizures" of the person are so substantially less intrusive than arrests that the traditional rule requiring probable cause is simply not applicable. *See also Florida v. Royer,* 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983); Lafave, "Street Encounters" and The Constitution: Terry, Sibron, Peters, and Beyond, 67 Mich.L.Rev. 39 (1968).

█ It is now a basic principle underlying most search and seizure questions that "[t]he *Fourth Amendment of the United States Constitution,* and Article III, Section 6 of the *West Virginia Constitution* protect an individual's reasonable expectation of privacy." Syllabus Point 7, *State v. Peacher, supra.* Aldridge, however, had, at most, only a very limited reasonable privacy interest in keeping a glove on his cut hand.

█ Also, he had displayed his wound in public after the killing. The Fourth Amendment "provides no protection for what 'a person knowingly exposes to the public' ...." *United States v. Dionisio,* 410 U.S. 1, 14, 93 S.Ct. 764, 771, 35 L.Ed.2d

67, 79 (1973), *quoting Katz v. United States,* 389 U.S. 347, 351, 576, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967); *see generally Davis v. Mississippi,* 394 U.S. 721, 723–25, 89 S.Ct. 1394, 1396, 22 L.Ed.2d 676, 679 (1969).

█ The "fruit of the poisonous tree" doctrine has no application when the government learns about evidence from an independent source. *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); *Silverthorne Lumber Co. v. United States,* 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1920); *Bynum v. United States,* 274 F.2d 767 (D.C.Cir.1960); *see* Pitler, "The Fruit of the Poisonous Tree", Revisited and Shepardized, 56 Calif.L.Rev. 579 (1968). Facts illegally obtained do not "become sacred and inaccessible. If knowledge of them is gained from an independent source they may be proved like any others ...." *Silverthorne Lumber Co., supra,* 251 U.S. at 392, 40 S.Ct. at 183, 64 L.Ed.2d at 321. The independent source limitation on the exclusionary rule has been applied to facts learned by the police both before and after an alleged illegal search or seizure. *See, e.g., United States v. Bacall,* 443 F.2d 1050 (9th Cir.1971); J. Hall, Jr., *Search and Seizure* § 22.5 (1982); 3 W. Lafave, *Search and Seizure* § 11.4 (1978). We recognized the independent source doctrine in *State v. Peacher, supra,* approving a search pursuant to a warrant that had been issued upon a supporting affidavit that had untainted evidence establishing probable cause.

█ Fault in the authorization for taking the first blood sample (the order was not founded upon affidavit or sworn testimony) did not preclude the State from taking a second valid blood sample.[5] The first blood sample did not lead to the second blood sample; both samples resulted from information about and observation of a laceration on Aldridge's hand.

During the first trial, the state learned of certain inadequacies in its first blood

---

5. We have recognized or applied the fruit of the poisonous tree doctrine in a number of cases. *See, e.g.,* Note 3, *State v. Winston,* 170 W.Va. 555, 295 S.E.2d 46 (1982); *State v. Hawkins,* 167 W.Va. 473, 280 S.E.2d 222, 227 (1981); *State v.*

*Stone,* 165 W.Va. 266, 268 S.E.2d 50, 54 (1980); Note 2, *State ex rel. Williams v. Narick,* 164 W.Va. 632, 264 S.E.2d 851 (1980); *State v. Williams,* 162 W.Va. 309, 249 S.E.2d 758 (1978).

test analyses. Also, by the time of the second trial, the State's criminal investigation laboratory had acquired more sophisticated blood-typing capability involving enzyme testing. There were practical reasons for a second blood test that could have, but did not, work to Aldridge's advantage.

We have considered all remaining assignments of error including those relating to competency to stand trial and evidentiary insufficiency, and find no merit in any of them.

For the foregoing reasons, the judgment of the Circuit Court of Logan County is affirmed.

Affirmed.