# STATE OF WEST VIRGINIA
## SUPREME COURT OF APPEALS

**State of West Virginia,**
**Plaintiff Below, Respondent**

**vs.)     No. 18-0967 (Kanawha County 18-F-189)**

**Jeffrey Thomas Phipps,**
**Defendant Below, Petitioner.**

**FILED**
**June 18, 2020**
EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

### MEMORANDUM DECISION

Petitioner Jeffrey Thomas Phipps appeals his conviction of nineteen counts of first-degree sexual assault and five counts of first-degree sexual abuse of nine-year-old E.W. and five-year-old N.W., and one count of display of obscene material to a minor, resulting in a 165-655 year sentence.[1] Respondent State of West Virginia filed a summary response.[2]

Upon consideration of the standard of review, the parties' briefs, and the record on appeal, the Court finds no substantial question of law or prejudicial error. For these reasons, a memorandum decision affirming petitioner's conviction is appropriate under Rule 21 of the Rules of Appellate Procedure.

Petitioner cared for a wheelchair-bound woman, Sharon K., in her home. In exchange for the care he provided to the disabled homeowner, petitioner was permitted to live in the home with her. In November 2017, Tracy W. and nine-year-old E.W. and five-year-old N.W. also moved into the home with petitioner and Sharon K.[3] Tracy W. had recently divorced E.W.'s uncle and they had lived with her father, who was allegedly abusive towards her and the children. Petitioner asked Sharon K. to let Tracy W. and the children move in, and she agreed.[4] Petitioner and Sharon K. lived in the basement of the home, while Tracy W. and the children lived upstairs.

During the time that Tracy W. and the children lived with petitioner, petitioner formed close relationships with both of the young boys, especially E.W. Petitioner would take the boys to and from school, and they would often help him as he did construction on the vacant house next door. E.W. frequently slept downstairs in the basement with petitioner. At some point, Tracy

---

[1] Mr. Phipps is represented by Matthew Brummond, Public Defender Services, in this appeal.

[2] The State is represented by Patrick Morrisey, Attorney General, and Holly Flanigan, Assistant Attorney General.

[3] Tracy W. was N.W.'s biological mother and E.W.'s guardian.

[4] Tracy W. testified at trial that petitioner was her father's best friend.

W.'s friend, Tiedra S., began staying at the house with them. On December 4, 2017, petitioner started telling Tiedra S. personal things about himself, and he revealed to her that on multiple occasions he had woken up to find E.W. with either his mouth on petitioner's penis or his hands inside petitioner's pants, and that he was concerned E.W. would get into trouble for doing these things to him.

The next day, Tiedra S. told Tracy W. what petitioner had told her. When Tracy W. spoke with E.W. about it, he reluctantly confirmed that petitioner had engaged him in sexual acts. Petitioner was outside doing house work with Tracy W.'s brother, Robbie, when Tracy W. confronted petitioner about sexually molesting her child. When petitioner nervously denied that he had molested E.W., Robbie began to physically fight with petitioner. Tracy W. ran inside to call the police department. During the altercation, petitioner hotwired Sharon K.'s truck and drove off before officers arrived at the scene. Upon arriving at the home, Patrolman Hannah Moutz and Detective Eddie Whitehead from the Charleston Police Department spoke with Tracy W. and Tiedra S.[5] Detective Whitehead advised Tracy W. that they would contact the Child Advocacy Center (CAC) to schedule a forensic interview for E.W. The next morning, E.W. revealed to Tracy W. that Petitioner had also engaged in sexual acts with N.W. Tracy W. called Detective Whitehead, who scheduled both boys for forensic interviews at the CAC that same day.

During the forensic interviews of N.W. and E.W. on December 6, 2017, they disclosed very descriptive and graphic details about the numerous instances of sexual assault and sexual abuse by petitioner which involved anal and oral sex. Most of the sexual acts took place in petitioner's basement bedroom. E.W. said petitioner sometimes used Vaseline during these sexual acts. He described the Vaseline container as a square, yellow container with a blue top that petitioner kept on the counter. He also described that during some of the sexual acts that occurred, petitioner would ejaculate on the wall next to his bed.

After watching E.W.'s forensic interview, Detective Whitehead obtained a search warrant for petitioner's bedroom on December 8, 2017. Detective Adam Kuhner from the Crime Scene Unit was one of the officers who executed the search warrant. During the search of the residence, the Vaseline container was located on a bookshelf in petitioner's bedroom. Detective Whitehead had circled a section of wall next to petitioner's bed based on E.W.'s disclosure that petitioner would ejaculate on the wall. The area was circled as an indication to the Crime Scene Unit to test that area because nothing was visible to the naked eye. When the wall where E.W. said petitioner ejaculated was examined using the alternate light source and tinted lens, a bodily fluid was located and collected. This evidence was forensically tested and analyzed by the West Virginia State Police Crime Lab. The results identified the semen "From wall" as a DNA match with petitioner's DNA sample.

At trial, the State called four police officers to testify about forensic evidence obtained from petitioner's bedroom. The defense alleged that Tracy W. attacked petitioner and coached the

---

[5] A wanted person bulletin was completed by Detective Whitehead, and petitioner was located five days later at the Tamarack Rest Area in Beckley, where he was apprehended by Sgt. McMillon of the West Virginia State Police. Petitioner was transported to the hospital for injuries sustained prior to his arrest and was later transported to the Southwestern Regional Jail.

2

children to oust him from the home for financial gain. Petitioner cared for the homeowner in exchange for living there. However, after removing petitioner from the home, Tracy W. arranged to take over his caregiver role as a paid aide. He further argued that Tracy W. also allowed people to move in, including Tiedra S., the family friend who allegedly raised concerns about petitioner, over the homeowner's objections. Petitioner introduced evidence indicating that Tracy W. had an economic motive to coach false accusations in efforts to take over his caretaker role. Petitioner also attempted to tie this motive to the forensic evidence by testifying that he had bragged to Tracy W. about his sex life with adult women to a degree of detail that allowed her to direct the police where to conduct their search.

Petitioner was ultimately convicted by a jury of nineteen counts of first-degree sexual assault and five counts of first-degree sexual abuse of E.W. and N.W., and one count of display of obscene material to a minor. His original sentencing order was entered by Judge Dan Greear.[6] By amended sentencing order of Judge Tera Salango dated December 19, 2018, petitioner was sentenced to 165-655 years in prison, with extended supervision of 50 years by probation upon release, and given credit for 323 days in jail.[7]

On appeal, petitioner first argues that the circuit court erred by not suppressing evidence seized from his bedroom. Petitioner asserts that police illegally searched his bedroom on December 5, prior to obtaining a search warrant on December 8, that the search was therefore illegal, and that the circuit court should have excluded its fruits.

According to the State's timeline, police responded to the sexual assault complaint on December 5. The first officer on the scene learned that petitioner lived in a basement bedroom. The lead detective then arrived and did not report any search at that time. The police then arranged for the CAC to interview the victims on December 6. The detective watched the interviews, and based on the victims' reports, obtained a search warrant on December 7. That search warrant was executed the following day. During this search, the police used a UV light and tinted lens to scan for bodily fluids. The scan illuminated a stain that later tested positive for petitioner's semen.

Petitioner argues that the State's timeline is impossible because during the CAC interview, E.W. said the stain was "[o]n the wall -- his wall, and the detective came and scanned it or something and found all that." The CAC interview happened on December 6, and the police claim the search did not happen until December 8. Petitioner contends that E.W. described what the police did, how they did it, and what they found two days before the police had the authority to conduct the search E.W. witnessed. Petitioner maintains that the most reasonable explanation is that on December 5, the police searched petitioner's bedroom, tried to mask the constitutional violation by swearing out an affidavit to a magistrate on December 7, and then reconstructed the original, illegal search.

---

[6] Following entry of the original sentencing order, Tera Salango was elected as circuit judge.

[7] Although the parties' briefs state that petitioner was sentenced to 165-665 years in prison, the West Virginia Division of Corrections Certified Commitment Order states that petitioner was sentenced to 165-655 years.

Petitioner maintains that he was prejudiced because the evidence gathered from the search likely impacted the jury's verdict. Citing *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824 (1967), petitioner asserts that the State cannot meet its burden of proving the error did not contribute to the verdict because the case came down to whether jurors believed petitioner or the victims, and any evidence probative of that dispute impacted the jury's deliberations, and seemingly independent evidence that a child knew the location of an invisible semen stain would weigh heavily in the State's favor. The prosecution's first witness was the lead detective who conducted the search, and the State's next three witnesses also testified concerning the search, chain of custody, and analysis performed on the forensic evidence. So, petitioner contends that four out of the State's nine witnesses testified to corroborate an accusation that the victims had not even made in open court yet. Petitioner argues that corroboration was essential to the State's case, and as presented by the State, the evidence gathered from the search was highly persuasive. He contends that the search was illegal, and by representing the evidence as independent corroboration of the victims' accusations, the State violated his rights.

Conversely, the State contends that Petitioner is now challenging the constitutionality of the search and seizure of evidence from his bedroom for the first time on appeal. Thus, the issue has been waived. Upon review of the record, we conclude that the State's assertion is correct. Petitioner did not file a motion to suppress or otherwise challenge the search and seizure below. Rather, when questioning the CAC interviewer at trial about E.W.'s interview, Petitioner's counsel merely insinuated that a discrepancy existed as to when the specimens were collected. Ordinarily, "this Court will not consider an error which is not properly preserved in the record nor apparent on the face of the record," Syl. Pt. 4, *State v. Browning*, 199 W.Va. 417, 485 S.E.2d 1 (1997) (citation omitted). As this Court has made clear,

> [t]he fundamental purpose of an objection to evidence is to bring to the court's attention potentially inadmissible evidence so that the court may make a ruling on the question. A corollary principle is that ordinarily a party may not claim evidentiary error on appeal where no objection is made at the trial level. This is designed to prevent a party from obtaining an unfair advantage by failing to give the trial court an opportunity to rule on the objection and thereby correct potential error.

*Wimer v. Hinkle*, 180 W. Va. 660, 663, 379 S.E.2d 383, 386 (1989). Accordingly,

> [t]o preserve an issue for appellate review, a party must articulate it with such sufficient distinctiveness to alert a circuit court to the nature of the claimed defect. The rule in West Virginia is that parties must speak clearly in the circuit court on pain that, if they forget their lines, they will likely be bound forever to hold their peace . . . [I]t must be emphasized that the contours for appeal are shaped at the circuit court level by setting forth with particularity and at the appropriate time the legal ground upon which the parties intend to rely.

*State ex rel. Cooper v. Caperton*, 196 W.Va. 208, 216, 470 S.E.2d 162, 170 (1996). This "raise or waive" rule also "prevents a party from making a tactical decision to refrain from objecting and, subsequently, should the case turn sour, assigning error (or even worse, planting an error and nurturing the seed as a guarantee against a bad result)." *State v. LaRock*, 196 W.Va. 294, 316, 470 S.E.2d 61 3, 635 (1996). The record here demonstrates that petitioner did not challenge the search and seizure of evidence at the circuit court level. For purposes of appeal, petitioner has thus waived this issue.[8]

In his second assignment of error, petitioner asserts that the circuit court erred, and he was prejudiced, by provisionally excluding a Department of Health and Human Resources (DHHR) investigation into Tracy W., which was relevant to his defense. Petitioner argued at trial that Tracy W. had an economic incentive to coach false accusations against petitioner, and evidence that she followed through on that motive makes it more likely she coached the boys than without the evidence.

Neither petitioner nor Tracy W. owned the home in which they lived. Petitioner cared for the homeowner in exchange for room and board, but after Tracy W. evicted Petitioner, she

---

[8] Even if this issue had not been waived, no constitutional violation occurred in the admission of evidence obtained from petitioner's bedroom wall because petitioner fails to show that a warrantless search occurred on December 5, 2017. Petitioner bases his claim on a single statement E.W. made during his forensic interview on December 6, 2017. During his forensic interview, E.W. stated that petitioner would ejaculate "[o]n the wall—his wall, and the detective came and scanned it or something and found all that." According to petitioner, E.W.'s statement demonstrates that the detective conducted an illegal search of petitioner's bedroom on December 5, 2017, and thus, the evidence seized on December 8, 2017, pursuant to the search warrant obtained based on E.W.'s disclosures during the forensic interview, should have been excluded. The State contends, and we agree, that while Detective Whitehead may have looked at the wall in petitioner's bedroom on December 5, 2017, petitioner offers nothing but speculation that he did anything other than respond to the complaint. Neither of the narratives provided by the investigating officers indicate any search took place on December 5, 2017. Tracy W. also confirmed that no search took place. She testified that the police took statements, instructed her not to touch anything, and "didn't start . . . the investigation until they had the forensic kits and the people who could . . . document that stuff."

Further, even if the scan of the wall had violated petitioner's Fourth Amendment rights, the independent source doctrine would permit the admission of this evidence because the search warrant was sought as a result of E.W.'s disclosures during his interview, not the scan. *See* Syl. Pt. 4, *State v. Aldridge*, 172 W. Va. 218, 304 S.E.2d 671 (1983)("The exclusionary rule has no application when the state learns from an independent source about the evidence sought to be suppressed."). *See also* Syl. Pt. 9, *State v. Peacher*, 167 W. Va. 540, 280 S.E.2d 559 (1981) ("An affidavit in support of an application for a search warrant which contains information that antedates, and is totally independent of, information learned from an unconstitutional search, as well as information from the unconstitutional search, may still be the basis upon which a valid search warrant may issue, if the information in the affidavit, excluding that information attributable to the unconstitutional search, is sufficient to justify a finding of probable cause.").

arranged to be paid to take care of the homeowner. Petitioner contends that Tracy W. also allowed other people, including Tiedra S., to move in without the homeowner's consent. The court excluded evidence that in the spring of 2018, a citizen reported concerns about the homeowner's care to the DHHR. Petitioner contends that DHHR investigated and discovered that since he moved out of the home, Tracy W. had neglected the homeowner and forced her to live in deplorable conditions, finding that she "ha[d] not been meeting [the homeowner's] needs. [She] ha[d] taken over [the homeowner's] finances and [was] using [her] money to buy drugs and alcohol to party with her friends."

At trial, the defense argued that Tracy W.'s motive to oust petitioner and exploit the homeowner caused the allegations—that she coached her children to level false accusations for financial gain. Petitioner contends that evidence that Tracy W. actually did exploit the homeowner, as opposed to merely having an opportunity to do so, made it more probable she coached the victims than without the evidence. He maintains that by provisionally excluding the evidence, the court prejudiced petitioner's ability to plan a defense, and the jury convicted him following an incomplete presentation of the evidence. Petitioner argues that had the jury heard the whole truth—that a governmental agency had independently investigated Tracy W. for financially exploiting a vulnerable adult, and that its investigator confirmed that the exploitation was true—it could have impacted how the jury assessed petitioner's and the State's theories of the case.

Conversely, the State argues that petitioner did not object to the circuit court's ruling on its motion in limine provisionally excluding certain evidence. Thus, it contends this issue has been waived. Prior to trial, the State filed a motion in limine to exclude evidence regarding the DHHR's investigation into whether Tracy W. was neglecting or financially exploiting Sharon K. The record reflects very little discussion on the motion and no objection by trial counsel at this juncture. Petitioner's counsel stated that he did not intend to use the DHHR records pertaining to the investigation at trial. In ruling on the motion, the circuit court provisionally granted it, precluding mention of the investigation "unless something occurs in trial that gives you, Mr. Hamilton, basis to think that it's become relevant and needs to be addressed." Should that time come, whether "during cross or at any point during the trial," counsel was instructed to "point it out to the Court and we can address them at that point."[9]

This Court reviews "a circuit court's decision to exclude evidence for an abuse of discretion[.]" *State v. Bowling*, 232 W. Va. 529, 540, 753 S.E.2d 27, 38 (2013). "'The action of a trial court in admitting or excluding evidence in the exercise of its discretion will not be disturbed by the appellate court unless it appears that such action amounts to an abuse of discretion.' Syl. Pt. 10, *State v. Huffman*, 141 W.Va. 55, 87 S.E.2d 541 (1955), *overruled on other grounds by State ex rel. R.L. v. Bedell*, 192 W.Va. 435, 452 S.E.2d 893 (1994)." Syl. Pt. 2, *State v. Doonan*, 220 W.Va. 8, 640 S.E.2d 71 (2006).

The circuit court expressly left open the evidentiary door in the event trial counsel deemed the DHHR investigation into Tracy W. necessary or relevant as trial progressed. At that point, the

---

[9] Despite his failure to object, petitioner asserted in his Motion for Judgment of Acquittal and For New Trial that evidence of the CPS investigations was relevant and material to the credibility of Tracy W. The circuit court denied the motion, finding that its prior ruling on the issue was proper.

6

circuit court would have addressed the admissibility of the evidence. But since that point never arose, petitioner can only speculate as to the admissibility of the evidence pursuant to Rules of Evidence 403 and 404 and the impact, if any, its admission would have had on the outcome of the trial. Clearly, the circuit court's ruling was a sound exercise of discretion, and it committed no error in provisionally excluding the evidence, as it was irrelevant to the issue of whether petitioner sexually assaulted E.W. and N.W.

For these reasons, we affirm petitioner's conviction and the circuit court's December 19, 2018, amended sentencing order.

Affirmed.

**ISSUED**: June 18, 2020

**CONCURRED IN BY**:

Chief Justice Tim Armstead
Justice Margaret L. Workman
Justice Elizabeth D. Walker
Justice Evan H. Jenkins
Justice John A. Hutchison