STATE OF WEST VIRGINIA

*v.*

NICK JOHNSON

(No. 13620)

Decided July 13, 1976.

*John C. Ashworth* for plaintiff in error.

*Chauncey H. Browning,* Attorney General, *Richard E. Hardison,* Deputy Attorney General, *Fredric J. George,* Assistant Attorney General, for defendant in error.

CAPLAN, JUSTICE:

At the October Term, 1974, of the Circuit Court of Raleigh County, the defendant, Nick Johnson, was indicted by the grand jury serving said circuit court for the murder of Marian McCargish. The pertinent part of the indictment charged that on the fifth day of July, 1974 Nick Johnson "unlawfully, feloniously, maliciously, wilfully, deliberately and premeditatedly did slay, kill, and murder one Marian McCargish . . . ." Upon arraignment the defendant entered a plea of not guilty and the matter was set for trial.

The jury, after hearing and considering the evidence adduced on behalf of the state and the defendant, returned a verdict of guilty of murder in the second degree. By order dated June 27, 1975 the court denied the defendant's motion for a new trial and "ordered the defendant forthwith sent to Huttonsville Diagnostic and Correctional Institution for a period of sixty days for diagnostic study." This appeal followed.

The defendant, Nick Johnson, a fifty-eight year old former coal miner, lived alone in a camper trailer in the coal camp community of Fireco in Raleigh County. It appears from the record that on July 5, 1974, the date of this unfortunate homicide, Johnson was at home in his camper trailer, having just returned from Beckley. Marian McCargish, the deceased, resided in the State of Maryland but at the time of the shooting subject was visiting relatives in Raleigh County. He had once lived in Raleigh County at which time he had been slightly acquainted with the defendant. On the above date he stopped at the defendant's trailer for a visit. It is obvious that both parties had been drinking intoxicating liquors prior to and during this visit.

At approximately eight o'clock that evening Manuel McCargish, a brother of the deceased and a resident of Raleigh County, went to the Johnson trailer for the purpose of taking his brother home. Manuel testified that as he approached the trailer he could see that his brother and Mr. Johnson had been fighting with each other and, in fact, were still holding their knives. He talked them into putting their knives away and prevailed upon his brother to start home. Marian, however, turned back and began to argue again with the defendant during which argument they again went into the trailer for another drink. Shortly thereafter the defendant ordered the brothers out of the trailer. Manuel did leave but the deceased stayed and further arguing and fighting took place between him and the defendant. They finally emerged from the trailer and proceeded to a spot where Manuel was sitting in a lawn chair at which time Johnson asked Manuel why everyone was picking on him.

Manuel explained that he was merely there to get his brother and that he was not picking on him. While they were talking the deceased attempted to take the defendant's gun from him but the defendant turned and went out onto the road. He then ordered the brothers to leave and fired a shot into the ground between them. Manuel testified: "Mr. Johnson pulled the gun and ordered us to leave and fired between us. Then my brother lunged toward Mr. Johnson and the gun. The gun went off one more time and then they had scuffled down the road several feet and I heard two more shots and my brother fell ...."

Shortly after Manuel McCargish had called the police two deputy sheriffs arrived on the scene. One of the deputies, Gary Roark, testified that upon arriving at the scene of the shooting he observed the body of Marian McCargish lying on the ground and indicated that he could feel no pulse. He then proceeded to the trailer and engaged in conversation with the defendant whom he indicated he knew quite well. As he approached the trailer defendant Johnson who was standing in the doorway said to him "I shot him, Gary." Deputy Roark then relieved Johnson of his gun, advised him of his rights and placed him in the back seat of his own automobile for the purpose of driving him to the hospital. It appears, however, that the defendant was later driven to the hospital by Victor Birchfield, another deputy sheriff. Upon being asked at the trial what the defendant had said on his way to the hospital Deputy Sheriff Birchfield testified "Well, he would ask me questions mostly. He would ask me did I kill him or is he dead and I would say yes Nick he is dead or yes you killed him and he would say well, I'm glad the son of a bitch is dead or I am glad I killed the son of a bitch. He asked me on several different occasions going to the hospital if he killed the man."

Johnson was taken to the same hospital where the deceased was taken and after a wound on his head was dressed he was released. A blood sample was also taken

from the defendant and the deceased by the Criminal Identification Bureau of the State Police. A report of the bureau of the analysis of these blood samples disclosed that the body of the deceased contained .33% blood alcohol by weight and the blood alcohol by weight of the defendant was .30%. An autopsy revealed that McCargish had been shot once in the leg and in the chest, the latter wound causing his death. The third round fired has never been found.

The following assignments of error are relied upon by the defendant: (1) The admission into evidence of certain oral inculpatory statements allegedly made by the defendant to the arresting officer without first having determined the voluntariness of such statements out of the presence of the jury; (2) the suppression and exclusion from evidence of certain oral exculpatory statements allegedly made by the defendant to the arresting officer; (3) the refusal of the trial court to direct a verdict of acquittal; (4) the giving of instructions permitting the jury to find the defendant guilty under the evidence of first degree murder, second degree murder or voluntary manslaughter; and (5) the action of the court ordering the defendant committed for diagnostic evaluation without permitting a stay of execution as provided in *W. Va. Code*, 1931, 62-7-1.

The first assignment of error involves two statements which state witnesses testified were made by the defendant. Each of those statements will be discussed separately.

On direct examination Deputy Roark testified, as hereinbefore noted, that as he approached the defendant after the shooting, the defendant exclaimed "I shot him, Gary." It is contended that this statement, amounting to a confession, should not have been admitted into evidence without the court first having determined the voluntariness thereof in a hearing out of the presence of the jury. In support of his position the defendant relies principally on three recent cases, namely, *State v. Smith,*

_____ W. Va. _____, 212 S.E.2d 759 (1975); *Spaulding v. Warden, W. Va. Penitentiary*, _____ W. Va. _____, 212 S.E.2d 619 (1975); and, *State v. Fortner*, 150 W. Va. 571, 148 S.E.2d 669 (1966).

These cases stand for the proposition that it is the mandatory duty of the trial court, whether requested or not, to hear evidence and to determine in the first instance out of the presence of the jury the voluntariness of an oral or written confession or an inculpatory statement amounting to an admission allegedly made by the accused, prior to admitting such confession or statement into evidence. The failure to provide such hearing constitutes reversible error.

The circumstances under which this statement was made to Deputy Roark are significant in resolving this issue. The evidence reveals that the defendant and Roark knew each other "quite well"; that the alleged statement was uttered by the defendant spontaneously prior to any action taken by Roark or any law officer; and, that at the time the statement was made the defendant was not under arrest or in any manner in custody, nor was he undergoing interogation by the police.

In each of the three cases relied upon by the defendant the statements complained of were made while the defendant was under arrest or at least under some custodial authority. In each case the respective defendant at the time the statement was made was being interrogated by the police and was subject to that intimidation which necessarily accompanies such interrogation. In those circumstances the voluntariness of a defendant's inculpatory statement must be questioned and therefore must be determined in an *in camera* hearing prior to the admission of such statement in evidence.

The situations reflected in *Smith, Spaulding,* and *Fortner* did not exist in the instant case. Here, defendant Johnson made a spontaneous statement to Deputy Roark who he obviously considered a friend. There had been no arrest, no custodial supervision of any kind and

no police interrogation. Nothing in the evidence tends to show that this spontaneous statement was made as a result of threat or intimidation. In these circumstances, there being no dispute in the testimony and there having been no objection to the introduction of the statement, the principles enunciated in the above cited cases do not apply and such *in camera* hearing was not required.

However, regarding the other statement alluded to in this assignment of error, that contained in the testimony of Deputy Birchfield wherein he attributed to the defendant the statement, "I'm glad the son of a bitch is dead or I am glad I killed the son of a bitch," our conclusion is different. When this inculpatory statement was uttered by the defendant he had already been placed under arrest and had been advised of his rights as an accused. He was definitely in the custody of a police officer and was then subject to the pressures of such arrest and custody. In these circumstances the failure of the trial court to provide the defendant with a voluntariness hearing outside the presence of the jury constitutes reversible error.

The defendant's second assignment of error is based on the court's denial of a motion to reopen to permit the introduction of evidence pertaining to exculpatory statements allegedly made by the defendant to an arresting officer. The reason for the court's denial of this motion was that such evidence would be merely cumulative, the defendant having testified that he was sorry that Marian McCargish was dead and that he had not intended to kill him. Even if the proffered evidence were cumulative, it contained statements which were exculpatory, certainly, at least, in relation to the element of malice, and the defendant was entitled to have it considered by the jury.

The motion to reopen and the court's denial thereof arose under the following circumstances. Defense counsel, prior to the trial, had asked Deputy Birchfield if the

defendant had made any statements regarding the shooting. Although his answer was in the negative, he subsequently testified to the inculpatory statements of the defendant as noted hereinabove. This came as a complete surprise and defense counsel then learned that the defendant had made other statements which counsel believed would tend to show that he did not intend to kill the deceased.

We are of the opinion that the trial court abused its discretion and committed reversible error in failing to permit a reopening to allow the presentation of this evidence for the consideration of the jury. Such evidence was material in the consideration of the defendant's guilt or innocence, or, at the very least, it was material to the degree of the crime, determining the penalty, should he be found guilty.

In *United States ex rel. Thompson v. Dye* (3rd Cir. 1955), 221 F.2d 763, *cert. den.*, 350 U.S. 875, 100 L.Ed. 773, 76 S.Ct. 120 (1955) it was held that where the prosecution was aware of certain evidence relative to the intoxicated condition of the defendant at the time of the commission of the crime which was material to the issues of guilt or penalty, but suppressed such evidence, such suppression constituted reversible error, as a denial of due process of law. It was therein further held that such evidence was so vital to the defendant's case that it should have been allowed even though it was cumulative.

Citing the *Dye* case with favor, the Supreme Court, in *Brady v. Maryland*, 373 U.S. 83 (1963) expressed its concern in the following cogent language: "We now hold that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *See, United States v. Keogh*, 391 F.2d 138, 34 A.L.R.3d 1 (2nd Cir. 1968); *United States ex rel. Almeida v. Baldi*, 195 F.2d 815 (3rd Cir. 1952); *Mooney v. Holohan*, 294 U.S. 103 (1935) and *Pyle v. Kansas*, 317 U.S. 213 (1942).

The third and fourth assignments of error concern the sufficiency of the evidence. Although the Court is divided on that issue, the majority is of the opinion that there was sufficient evidence to permit jury consideration. In the factual situation of this case the trial court did not err in denying the defendant's motion for a directed verdict of acquittal. This Court in Syllabus No. 1 of *State v. Fischer*, ____ W. Va. ____, 211 S.E.2d 666 (1974) said:

> Upon motion to direct a verdict for the defendant, the evidence is to be viewed in light most favorable to prosecution. It is not necessary in appraising its sufficiency that the trial court or reviewing court be convinced beyond a reasonable doubt of the guilt of the defendant; the question is whether there is substantial evidence upon which a jury might justifiably find the defendant guilty beyond a reasonable doubt.

*See, State v. West*, 153 W. Va. 325, 168 S.E.2d 716 (1969).

The record reveals that the defendant and the deceased were together for several hours, during which time they quarrelled and physically assaulted each other. Obviously ill feelings existed between them. Although the defendant testified that he had no fear at the time, he armed himself with a pistol, and, by his own exclamation, declared that he had shot the deceased. Upon these and other facts in the record the jury was fully instructed as to the defendant's theory of the case. In these circumstances, viewing the evidence in a light most favorable to the prosecution as required by *Fischer* and *West*, we believe that the court was warranted in permitting the case to go to the jury.

In relation to the fourth assignment of error, it is our opinion that the evidence, while not strong, was sufficient to support a jury finding of guilty of the offenses therein charged.

For the reasons stated in this opinion the judgment of the Circuit Court of Raleigh County is reversed and the case is remanded for a new trial.

*Reversed and remanded.*