STATE OF WEST VIRGINIA

*v.*

PATRICIA M. KELLEY

(No. 14822)

Decided December 18, 1981.

*Richard L. Douglas, Rice, Hannis & Douglas,* for appellant.

*Chauncey H. Browning,* Attorney General, *Homer A. Speaker,* Assistant Attorney General, for appellee.

PER CURIAM:

This is an appeal of a voluntary manslaughter conviction returned in the Circuit Court of Berkeley County against Patricia M. Kelley for the death of her two-year old son, Jason Lynn Kelley. Appellant contends that her confession should have been excluded at trial because she did not knowledgeably and intelligently waiver her right to counsel at the time she gave the confession to the West Virginia State Police.[1] We agree and reverse.

This opinion is comprised of three parts which relate to, first, appellant's history and the factual setting of the

---

[1] In view of our disposition of appellant's first assignment of error we need not address her two remaining assignments at length. The second assignment alleged that the prosecutor failed to develop an adequate foundation for his rebuttal of the appellant's medical evidence. The appellant's witness had been dismissed, and was unavailable to refute the prosecutor's rebuttal. This issue is unlikely to be presented on retrial, and we need not consider it here. Assignment number three is a further attack upon the admissibility of the appellant's statement and, in view of our disposition of the issue of the statement's admissibility under assignment one, need not be addressed.

evening the statement was taken, second, the results of psychological testing performed on the appellant, as introduced at the *in camera* hearing on the statement's admissibility, and, third, the law of this State in regard to statements taken from persons of low mental capacity.

## I.

Appellant, a life-long Berkeley County resident, was 23 years old at the time of trial. She testified that she was one of ten children and that her education was limited to six years of grade school, having been forced to quit school due to pregnency during the seventh grade at age 13. Her first child was born just before the appellant's fourteenth birthday. Since age twelve, appellant lived at her mother's home with Kenneth Ray Kelley. At age 16, after appellant's second child was born, Kenneth Ray Kelley and appellant were married. The couple continued to live with appellant's mother until the winter of 1978, when appellant entered the hospital for treatment of a knee problem.

Upon being released from the hospital, appellant changed her place of residence to a trailer near her mother's home, and for a short time, Jason Lynn Kelley lived with her at the trailer. Because appellant felt unable to care for the child, in her disabled condition, Jason Lynn was taken to live with appellant's relatives. For approximately three months before the child's death, she had very little contact with Jason Lynn.

Appellant was called to the hospital on June 25, 1979, in regard to Jason Lynn. The child had become unconscious, and, sometime after appellant's arrival, the child died. Appellant spent June 26 and 27, 1979, at the funeral home for the open-casket viewing of the deceased infant. There was considerable testimony that throughout this time appellant was distraught, and that she was under the influence of a prescribed sedative.

Preston Gooden, a member of the Department of Public Safety, arrived at the funeral home in the afternoon of June 27, 1979. The trooper indicated that he would be interested in any information which appellant had in

regard to the death of the child. Trooper Gooden returned to the funeral home in the evening with Trooper R.F. Sidow. The troopers found appellant and certain of her relatives at the funeral home and stated that they wanted to speak to appellant and her relatives. The relatives travelled by their own vehicle to the State Police barracks while appellant rode to the barracks in the police car which Troopers Gooden and Sidow.

The troopers agree that the first statement taken at the police barracks was that of Philip Mussalino, appellant's brother, and they have characterized the interrogation of Mussalino as "close to screaming," "near an hysterical state", and "very upset and crying". The interrogation of Philip Mussalino lasted approximately one-half hour, during which time appellant sat in an adjoining waiting room with her other relatives. Troopers Gooden and Sidow testified that it was possible that appellant could have heard the interrogation of Mussalino, and appellant testified that she heard her brother screaming and crying during the interrogation.

Interrogation of appellant began at 10:30 P.M., after appellant had been waiting outside the interrogation room for at least one hour. It is Trooper Gooden's testimony that he read appellant her *Miranda* rights at the outset of the interview and that appellant indicated that she understood her rights and did not wish to speak to an attorney. He took no special precautions to insure that the rights given were understood, but simply read to the appellant from the standard state police rights form.

Trooper Gooden then questioned the defendant and elicited a statement, subsequently admitted at trial, in which appellant admitted to having struck the deceased on the head with a crutch some three months before the child's death. Only after this statement was given did Trooper Gooden have appellant sign the waiver of right form which he had earlier read aloud, in conjunction with appellant's *Miranda* warnings.

## II.

At an *in camera* hearing on the admissibility of appellant's statement, appellant called three witnesses to address the issue of her capacity to understand and knowingly waive her rights.

Joanne Vincent, a remedial reading specialist, administered several reading comprehension examinations to appellant, and determined appellant's reading level to be low third grade. Vincent also administered tests of appellant's ability to comprehend material read to her, and found that oral reading improved appellant's comprehension to a fourth grade level. The witness' testing of the waiver of rights form signed by appellant showed the form to be written at between a sixth and seventh grade reading comprehension level and therefore it was the witness' opinion that appellant would not have been capable of comprehending the form.

Charles Jennings, a psychologist employed by Berkeley County Schools to perform psychological testing, administered the Stanford-Binet intelligence test to the appellant, who rated at an I.Q. of 50. This score qualifies the appellant as moderately mentally retarded or mentally deficient. Jennnings testified that he had examined the waiver of rights form signed by appellant and compared it to the appellant's intelligence level and that, in his opinion, she would not have been capable of understanding the implications of the waiver form.

James Robert Schwab, a psychologist employed by Berkeley County Schools to perform psychological evaluations of school children, testified that he had administered personality dynamics tests to the appellant, including an interview and Bender-Gestalt, Rorschach inkblot and Thenatic Apperception testing. Schwab stated that, given a stressful situation, it was likely that appellant would be unable to understand the waiver of rights as it appeared on the form she signed.

The State's rebuttal witness at the *in camera* hearing was Dr. Bradley Soule, a psychiatrist, who testified that,

in the thirty to forty minute interview which was his only contact with appellant, he had found her to be of average intelligence. Dr. Soule admitted, however, that "(a) psychiatrist's impression of intelligence is much less accurate, of course, that (sic) would be a psychologist's test."

### III.

In Syl. pt. 1 of *State v. Hamrick*, 160 W. Va. 673, 236 S.E.2d 247 (1977) we discussed the status of confessions by persons of diminished mental capacity:

> "Confessions elicited by law enforcement authorities from persons suspected of crimes who because of mental condition cannot knowledgeably and intelligently waive their right to counsel are inadmissible."

The requirement of *Hamrick* is that the decision to to waive the right to counsel be an intelligent decision. *Hamrick*, 236 S.E.2d at 250, *U.S. v. Dickerson*, 413 F.2d 1111 (7 cir. 1969). Our aim is to afford meaningful protection for the constitutional rights of persons of diminished mental capacity.

In furtherance of this aim, we have indicated that confessions of persons of low mental capacity must be received with caution.[2] In this case, the testimony of expert witnesses clearly establishes that appellant was incapable of knowingly and voluntarily waiving her rights. *State v. Boyd*, ____ W. Va. ____, 280 S.E.2d 669 (1981). As measured by the Stanford-Binet I.Q. standards appellant was of low intelligence. Her lack of any appreciable job experience, or any significant amount of time spent living independently from her mother points to an inability to deal effectively with routine life situations. The overwhelming evidence is that she could not understand the state police waiver of rights form which was read to her. The testimony of the State's rebuttal witness, Dr. Soule, did little to refute these findings in view of his admission

---

[2] *State v. Boyd*, ____ W. Va. ____, 280 S.E.2d 669, 682 (1981); *State v. Daggett*, ____ W. Va. ____, 280 S.E.2d 545, 554, (1981); *State v. Williams*, 162 W. Va. 309, 249 S.E.2d 758, 763 (1978).

that psychological testing is a more accurate measure of intelligence than his impressions from a rather brief interview.

The picture presented here is of a distraught woman of low mental capacity who was taken from the funeral home viewing of her deceased child, made to wait for an hour while a stormy interrogation of her brother was conducted in an adjoining room. Finally, late in the evening, at the outset of her interrogation, she was read her *Miranda* rights, which the evidence clearly indicates she was incapable of understanding. Considering these circumstances, the appellant's statement should not have been admitted because she was incapable of knowingly and intelligently waiving her constitutional rights.

Admission of the appellant's statement requires reversal, but we find no bar to retrial in these circumstances because a reversal for trial error, as distinguished from evidentiary insufficiency, does not invoke the prohibition against double jeopardy. *State v. Isler*, ___ W.Va. ___, 283 S.E.2d 836 (1981); *State v. Stanley*, ___ W.Va. ___, 284 S.E.2d 367 (1981). As we stated in Syllabus Point 5 of *State v. Frazier*:

> "In order to determine if there is evidentiary insufficiency that will bar a retrial under double jeopardy principles, such determination is made upon the entire record submitted to the jury and not upon the residual evidence remaining after the appellate court reviews the record for evidentiary error." 162 W. Va. 602, 252 S.E.2d 39 (1979).

There was no evidentiary insufficiency in the record submitted to the jury in this case and, accordingly, we reverse and remand for a new trial.

*Reversed and remanded.*