332 S.E.2d 147

**STATE of West Virginia**

v.

**Theodore Thomas COOK.**

**No. 16183.**

Supreme Court of Appeals of West Virginia.

Submitted Jan. 23, 1985.

Decided June 3, 1985.

Dissenting Opinion July 15, 1985.

George P. Stanton, III, Asst. Atty. Gen., Charleston, for appellee.

T.D. Kauffelt and James Kauffelt, Benjamin N. Snyder, Charleston, for appellant.

McGRAW, Justice:

Theodore Thomas Cook appeals from a final order of the Circuit Court of Kanawha County entered May 4, 1983, which confirmed his conviction of first degree murder without a recommendation of mercy and sentenced him to life in the penitentiary. He advances numerous assignments of error assertedly warranting reversal of his conviction. Disposition of a few of these assignments renders unnecessary addressing other assignments. Therefore, following a brief discussion of the circumstances resulting in his conviction, we will address each of the relevant assignments.

On May 19, 1981, the appellant met Roy Frye at a tavern near the appellant's home in Madison. After sharing a few drinks, Frye expressed a desire to purchase some marijuana. At the appellant's suggestion, the two men left in Frye's truck for the home of Mark Price in order to secure this purchase. When they arrived, Price indicated that he believed a friend who lived nearby might have some marijuana for sale. These three men, along with Mark's younger brother, Richie Price, a juvenile, went to this friend's house, but discovered that he was not there. The entourage then went to another tavern in Van, in order to await this friend's return, where Frye bought the group some beer, including a six pack upon their departure to again search for Mark's friend.

After failing to locate Mark's friend, the group first went to a bar in Whitesville, where Frye purchased a case of beer, and then to a liquor store, where he purchased liquor and mixers. Apparently, the other men also tried, on various occasions throughout the afternoon, to cash some of Frye's checks, with his consent, in order to purchase more alcohol or marijuana. In the course of their travels, Richie served as bartender, and according to his testimony, was instructed by his brother to mix Frye's drinks "a little bit stronger" than the others.

Eventually, Mark drove to a deserted road near the State Capitol in Charleston. At this point, the testimony begins to conflict. According to Richie, Frye, who was then extremely intoxicated, muttered, "I think you are going to rob me." The appellant testified that this statement was not made. Richie further testified that Frye and the appellant then exited the vehicle and began wrestling around. The appellant testified that he merely left the truck to relieve himself, and that Frye followed. In any event, after the two men got out of the truck, Mark Price picked up a ball peen hammer from the backseat and got out.

According to Richie, after the appellant subdued the much smaller Frye, his brother beat him to death with the hammer. According to the appellant, after he had relieved himself, he turned around to see Mark striking Frye in the head with the hammer. Both individuals testified, however, that the appellant then took Frye's checkbook and wallet from his pocket at Mark's instruction and returned to the truck with Mark, who drove the truck over Frye's dead or dying body as they were leaving.

After dining, the three men left Charleston in Frye's truck and headed for Cleveland, Ohio. They stopped and rested briefly at a Ripley motel, paying for their bill with one of Frye's checks. After their departure from Ripley, on their way to Cleveland, Mark was stopped by an Ohio police officer after being clocked at eighty-four miles per hour. Although the officer ascertained that none of the vehicle's occupants owned the truck, incredibly, he only required Mark to hand over his driver's license, after which they continued on to Cleveland.

Once in Cleveland, Mark sold the truck for one hundred dollars to a man he had met in a bar, and, along with the appellant, using Frye's checkbook, attempted to transfer funds from Frye's bank in Danville to a bank in Cleveland. On May 22, 1981, a Danville bank employee, who was aware of Frye's death, notified West Virginia authorities that the Cleveland bank had telephoned to verify Frye's account. Cleveland authorities were immediately notified that the three men were suspects in the murder of Frye. Later that day, Cleveland authorities were given the suspects'

full names and descriptions and the identification numbers of the warrants for their arrest. Upon checking a hotel frequented by transients, Cleveland police discovered that Mark Price's name appeared on the hotel register. The hotel clerk guided the police to Price's room and unlocked the door. The three men, who were sleeping, offered no resistance as they were then arrested.

Although neither Mark nor Richie Price would speak with Charleston police after their arrival in Cleveland in the early morning hours of May 23, 1981, the appellant indicated that he would speak with the officers concerning the crime. His statement substantially corresponded to the testimony of Richie Price, with the notable exceptions of his restraint of Frye during the killing and Frye's statement that he believed that he was about to be robbed.

## I

■■■ The appellant first challenges the validity of the warrant issued for his arrest. We note, however, that "An officer, with authority to conserve the peace, may, without a warrant, arrest any person who he, upon probable cause, believes has committed or is committing a felony, though it afterwards appears that no felony was actually perpetrated." Syl. pt. 2, *State v. Duvernoy*, 156 W.Va. 578, 195 S.E.2d 631 (1973); *see also* Syl. pt. 2, *State v. Drake*, 170 W.Va. 169, 291 S.E.2d 484 (1982); Syl. pt. 1, *State v. Sprouse*, 171 W.Va. 58, 297 S.E.2d 833 (1982); Syl. pt. 6, *State v. Craft*, 165 W.Va. 741, 272 S.E.2d 46 (1980). The standard for determining the existence of probable cause to make a warrantless arrest is set forth in Syllabus Point 1 of *State v. Plantz*, 155 W.Va. 24, 180 S.E.2d 614 (1971), which provides that, "Probable cause to make an arrest without a warrant exists when the facts and circumstances within the knowledge of the arresting officers are sufficient to warrant a prudent man in believing that an offense has been committed." *See also* Syl. pt. 3, *State v. Boswell*, 294 S.E.2d 287 (W.Va.1982); Syl. pt. 2, *State v. Meadows*, 292 S.E.2d 50 (W.Va.1982); Syl. pt. 2, *State v. Drake*,

*supra;* Syl. pt. 1, *State v. Hawkins*, 167 W.Va. 473, 280 S.E.2d 222 (1981); Syl. pt. 7, *State v. Craft, supra;* Syl. pt. 3, *State v. Duvernoy, supra*. In the instant case, the critical fact within the knowledge of the arresting officers at the time of the appellant's arrest was that the description of the appellant, who had been seen with Frye on the afternoon prior to his death, forwarded by the Charleston authorities, along with the appellant's name and warrant identification number, matched a Cleveland bank employee's description of one of the men who had attempted to transfer funds from Frye's West Virginia bank account two days after Frye's death. This fact, along with the additional circumstance of the description of Mark Price, who had been seen accompanying Frye and the appellant on the afternoon prior to his death, forwarded by the Charleston authorities, along with Price's name and warrant identification number, matching the same bank employee's description of the other man who had attempted to transfer funds from Frye's account, provided the arresting officers with ample probable cause to believe that an offense had been committed and that the appellant had been involved in its commission. We therefore hold that the appellant's arrest was not illegal.

## II

■■■ The appellant's next assignment of error is the trial court's admission of certain evidence seized from the hotel room pursuant to searches conducted without a warrant. With respect to warrantless searches, this Court noted in Syllabus Point 1 of *State v. Moore*, 165 W.Va. 837, 272 S.E.2d 804 (1980), that:

Searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment and Article III, Section 6 of the West Virginia Constitution—subject only to a few specifically established and well-delineated exceptions. The exceptions are jealously and carefully drawn, and there must be a showing by those who seek exemption that the exigencies of the situation made that course imperative.

*See also* Syl. pt. 3, *State v. Meadows, supra;* Syl. pt. 1, *State v. Weigand,* 169 W.Va. 739, 289 S.E.2d 508 (1982); Syl. pt. 1, *State v. Cain,* 169 W.Va. 772, 289 S.E.2d 488 (1982); Syl. pt. 1, *State v. Farley,* 167 W.Va. 620, 280 S.E.2d 234 (1981). We further noted, in Syllabus Point 2 of *State v. Moore, supra,* "The burden rests on the State to show by a preponderance of the evidence that the warrantless search falls within an authorized exception." *See also* Syl. pt. 4, *State v. Meadows, supra;* Syl. pt. 2, *State v. Farley, supra.* The State argues that the challenged search and seizure was proper under the "incident to a valid arrest" and "plain view" exceptions to the search warrant requirement.

In Syllabus Point 6 of *State v. Moore, supra,* this Court held, following *Chimel v. California,* 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969), that, "A warrantless search of the person and the immediate geographic area under his physical control is authorized as an incident to a valid arrest." *See also* Syl. pt. 4, *State v. Hodges,* 172 W.Va. 322, 305 S.E.2d 278 (1983); Syl. pt. 3, *State v. Drake, supra.* The rationale for this exception to the warrant requirement is that a search of the limited area immediately under the physical control of an arrested person is "necessary to uncover weapons that might be used against the arresting officer and to prevent destruction of evidence by the arrested party." *State v. Moore,* 165 W.Va. at 851, 272 S.E.2d at 813. In Syllabus Point 7 of *State v. Moore, supra,* following *Coolidge v. New Hampshire,* 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971), this Court held that:

A warrantless search of property in plain view is constitutionally permissible provided three requirements are met: "(1) the police must observe the evidence in plain sight without benefit of a search [without invading one's reasonable expectation of privacy], (2) the police must have a legal right to be where they are when they make the plain sight observation and, (3) the police must have probable cause to believe that the evidence seen constitutes contraband or fruits, instrumentalities or evidence of crime." Syllabus Point 3, in part, *State v. Thomas,* 157 W.Va. 640, 203 S.E.2d 445 (1974).

*See also* Syl. pt. 2, *State v. Boswell, supra;* Syl. pt. 4, *State v. Buck,* 170 W.Va. 428, 294 S.E.2d 281 (1982); Syl., *State v. Hanshaw,* 170 W.Va. 354, 294 S.E.2d 157 (1982); Syl. pt. 6, *State v. Vance,* 168 W.Va. 666, 285 S.E.2d 437 (1981); Syl. pt. 3, *State v. Farley, supra.* The rationale for this exception to the warrant requirement is that:

Where, once an otherwise lawful search is in progress, the police inadvertently come upon a piece of evidence, it would often be a needless inconvenience, and sometimes dangerous—to the evidence or to the police themselves—to require them to ignore it until they have obtained a warrant particularly describing it.

*Coolidge v. New Hampshire,* 403 U.S. at 467–68, 91 S.Ct. at 2039, 29 L.Ed.2d at 584.

In the present case, when the arresting officers entered the hotel room unannounced with shotguns drawn, the appellant and the Price brothers were sleeping in bed together. They offered no resistance and complied with the officers' order to "freeze." Each man was searched next to the bed, and the appellant and Mark Price were handcuffed. The officers then searched the immediate area around and underneath the bed, seizing some items of clothing. After this was completed, one of the officers began examining items located on a dresser some distance from the bed. One of these times was an address book which, upon closer inspection, was ascertained by this officer to belong to Roy Frye. Under the address book on the dresser was a checkbook which also, upon closer inspection, was ascertained to belong to Roy Frye. Two to three minutes later, after the officers had secured the scene, a scientific investigations unit arrived to "process" the hotel room. Although the Price brothers and the appellant were still in the room when this unit arrived, they were escorted out before it began its search of the premises. This unit seized the address book and the checkbook and took photographs of the room and its contents.

■ Unquestionably, the arresting officer's search of the top of the dresser was outside the scope of the immediate geographic area under the physical control of the three arrestees. Furthermore, the address book and the checkbook offered no immediately apparent evidence of criminal activity. In a strikingly similar case, the Second Circuit, in *United States v. Berenguer*, 562 F.2d 206, 210–11 (2d Cir.1977), held that seizure of a billfold from the top of a bureau was not justified under either the "incident to a valid arrest" or "plain view" exceptions where, although the defendant was in the same room, he was shackled to a companion on a bed and the billfold was clearly out of his reach, and, although the billfold contained large denomination currency, this was not apparent until after the billfold itself had been searched. In the present case, where the three arrestees, two of them handcuffed, were apparently seated on a bed with one or more shotguns pointed at them, the arresting officer's search of the top of the dresser outside of the area of their physical control was clearly unnecessary under either the law enforcement safety or protection of evidence rationales for both the "incident to a valid arrest" and "plain view" doctrines. Furthermore, the address book and the checkbook were obviously not weapons and offered no indicia of ownership.

■ The seizure of this evidence, along with the photographs taken of the room and its contents, was further complicated by the fact that it was executed by a second group of officers who began conducting their search after the arrestees were removed from the premises. On cross-examination, the arresting officer admitted at the suppression hearing that the room could have been secured and a warrant obtained prior to the search and seizure by this second group of officers. In this respect, the instant case bears resemblance to the circumstances involved in *Mincey v. Arizona*, 437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978), where arresting officers secured the scene of a homicide until detectives arrived ten minutes later to conduct a search that lasted four days. The Court, refusing to recognize a "murder scene exception" to the fourth amendment, stated that:

> There was no indication that evidence would be lost, destroyed, or removed during the time required to obtain a search warrant. Indeed, the police guard at the apartment minimized that possibility. And there is no suggestion that a search warrant could not easily and conveniently have been obtained.

437 U.S. at 394, 98 S.Ct. at 2414, 57 L.Ed.2d at 301. Similarly, in the present case, there was no excuse for the failure to obtain a warrant prior to the search of the motel room by the second group of officers after the premises had been secured. Thus, the State failed to meet its burden under Syllabus Points 1 and 2 of *State v. Moore, supra*, to show, by a preponderance of the evidence, that the exigencies of the situation with which the officers were confronted made the course of action taken imperative. Therefore, the evidence seized by the second group of officers, including the address book and the checkbook, was illegally obtained and should not have been admitted at the appellant's trial.

### III

■ The appellant's next assignment of error involves the admission of evidence seized from Mark Price at the time of his arrest. He concedes that he lacks standing to challenge the constitutionality of the search of Price. *See, e.g.*, Syl. pt. 2, *State v. Tadder*, 173 W.Va. 187, 313 S.E.2d 667 (1984). He maintains, however, that the existence of items taken from the victim in the possession of Price was irrelevant to the issue of his involvement either in the robbery or the homicide, and, therefore, these items should not have been admitted. With respect to the admissibility of evidence generally, this Court has consistently held that, "The action of a trial court in admitting or excluding evidence in the exercise of its discretion will not be disturbed by the appellate court unless it appears that such action amounts to an abuse of discretion." Syl. pt. 10, *State v. Huffman*, 141 W.Va. 55, 87 S.E.2d

541 (1955); *see also* Syl. pt. 2, *State v. Peyatt,* 173 W.Va. 317, 315 S.E.2d 574 (1983); Syl. pt. 6, *State v. Kopa,* 173 W.Va. 43, 311 S.E.2d 412 (1983); Syl. pt. 4, *State v. Ashcraft,* 172 W.Va. 640, 309 S.E.2d 600 (1983); Syl. pt. 3, *State v. Oldaker,* 172 W.Va. 258, 304 S.E.2d 843 (1983); Syl. pt. 3, *State v. Louk,* 171 W.Va. 639, 301 S.E.2d 596 (1983); Syl. pt. 2, *State v. Rector,* 167 W.Va. 748, 280 S.E.2d 597 (1981). In a prosecution for first degree murder and sexual battery, the court in *Hall v. State,* 381 So.2d 683, 690 (Fla.1979), held that results of comparisons between the hair of an accomplice and specimens discovered on the body of the victim were relevant to the defendant's guilt because the evidence introduced at trial indicated that the accomplice and the defendant were together on the night of the murders in question. Similarly, in the present action, the evidence, particularly the testimony of Richie Price, clearly demonstrated that the appellant and Mark Price were together on the night of the victim's death. Furthermore, the evidence seized from Mark Price, which implicated him in Frye's death, was consistent with the appellant's theory that he was more or less an innocent bystander to the killing. We therefore conclude that the trial court did not abuse its discretion in admitting evidence seized from the person of Mark Price.

## IV

The appellant next challenges the trial court's finding that he was capable of intelligently waiving his constitutional rights before making a statement to police shortly after his arrest. As he correctly notes, this Court held in Syllabus Point 1 of *State v. Hamrick,* 160 W.Va. 673, 236 S.E.2d 247 (1977), that, "Confessions elicited by law enforcement authorities from persons suspected of crimes who because of mental condition cannot knowledgeably and intelligently waive their right to counsel are inadmissible." *See also* Syl. pt. 1, *State v. Jackson,* 171 W.Va. 329, 298 S.E.2d 866 (1982); Syl. pt. 4, *State v. Adkins,* 170 W.Va. 46, 289 S.E.2d 720 (1982); Syl. pt. 1, *State v. Kelley,* 168 W.Va. 698, 285 S.E.2d 457 (1981); Syl. pt. 5, *State v. Boyd,* 167 W.Va. 385, 280 S.E.2d 669 (1981); Syl. pt. 5, *State v. Daggett,* 167

W.Va. 411, 280 S.E.2d 545 (1981). Furthermore, with respect to the burden of proof on this issue, this Court held in Syllabus Point 5 of *State v. Starr,* 158 W.Va. 905, 216 S.E.2d 242 (1975), that, "The State must prove, at least by a preponderance of the evidence, that confessions or statements of an accused which amount to admissions on part or all of an offense were voluntary before such may be admitted into the evidence of a criminal case." *See also* Syl. pt. 1, *State v. Hilliard,* 173 W.Va. 456, 318 S.E.2d 35 (1983); Syl., *State v. Wilson,* 170 W.Va. 443, 294 S.E.2d 296 (1982); Syl. pt. 1, *State v. Williams,* 171 W.Va. 556, 301 S.E.2d 187 (1983); Syl. pt. 1, *State v. Woods,* 169 W.Va. 767, 289 S.E.2d 500 (1982); Syl. pt. 1, *State v. Mitter,* 169 W.Va. 652, 289 S.E.2d 457 (1982); Syl., *State v. Sprouse,* 169 W.Va. 719, 289 S.E.2d 228 (1982); Syl. pt. 3, *State v. Persinger,* 169 W.Va. 121, 286 S.E.2d 261 (1982); Syl. pt. 1, *State v. Vance,* 162 W.Va. 467, 250 S.E.2d 146 (1978). Ultimately, however, as this Court recognized in Syllabus Point 3 of *State v. Vance, supra,* "A trial court's decision regarding the voluntariness of a confession will not be disturbed unless it is plainly wrong or clearly against the weight of the evidence." *See also* Syl. pt. 1, *State v. Taylor,* 174 W.Va. 225, 324 S.E.2d 367 (1984); Syl. pt. 4, *State v. Cheshire,* 173 W.Va. 123, 313 S.E.2d 61 (1984); Syl. pt. 4, *State v. Cecil,* 173 W.Va. 27, 311 S.E.2d 144 (1983); Syl. pt. 2, *State v. Gwinn,* 169 W.Va. 456, 288 S.E.2d 533 (1982); Syl. pt. 3, *State v. Goodmon,* 170 W.Va. 123, 290 S.E.2d 260 (1981); Syl. pt. 1, *State v. Vance,* 168 W.Va. 666, 285 S.E.2d 437 (1981); Syl. pt. 1, *State v. Lamp,* 163 W.Va. 93, 254 S.E.2d 697 (1979).

Unquestionably, the evidence submitted clearly demonstrated the appellant's intellectual deficiency. Three batteries of tests, two administered in connection with this criminal proceeding, produced full scale intelligence quotient scores of 42, 48, and 63, placing the appellant in the range of moderate mental retardation. Furthermore, the evidence indicated that the appellant, twenty-six years old at the time of his arrest, never completed the fourth grade, is functionally illiterate, and has considerable difficulty in meeting the normal demands of everyday life. On the other hand, the

appellant had been married, possessed a driver's license, suffers from no mental disease, had previous experience with law enforcement officials pursuant to a prior drug arrest, and indicated that he understood the seriousness and possible consequences of the charges against him. Additionally, there is no allegation of police deception or coercion and the largely exculpatory character of the statement given supports the trial court's conclusion that the appellant understood "the meaning and effect of any admission or confessions or statement against his own interests."

■ The trial court's evaluation of the conflicting evidence was both well-reasoned and thorough, considering not only the historic and scientific evidence presented, but also the appellant's demeanor and conduct in the courtroom. In *State v. Adkins*, 170 W.Va. at 54, 289 S.E.2d at 727, we held that:

> [W]here a person of less than normal intelligence does not have the capacity to understand the meaning and effect of his confession, and such lack of capacity is shown by evidence at the suppression hearing, it is error for the trial judge not to suppress the confession. However, where the defendant's lower than normal intelligence is not shown clearly to be such as would impair his capacity to understand the meaning and effect of his confession, said lower than normal intelligence is but one factor to be considered by the trial judge in weighing the totality of the circumstances surrounding the challenged confession.

As in *State v. Adkins*, 170 W.Va. at 54, 289 S.E.2d at 728, where the defendant's full scale intelligence quotient score was 49, and in *State v. Cheshire*, 173 W.Va. at 127, 313 S.E.2d at 65, where the defendant's scores were 59, 68, and 74, we conclude that the trial judge's ruling on this question, that the appellant's below average intelligence did not impair his capacity to understand the meaning and effect of his confession, was not clearly against the weight of the evidence presented or plainly wrong.

**V**

The appellant assigns as error the trial court's refusal to permit the testimony of Mark Price. Price, whose appeal of a murder conviction was pending at the time of the appellant's trial, had consented, against the advice of counsel, to answer two questions as follows:

Q. While the Jeep was parked at Hillcrest Drive, at any time did Roy Frye say, "I think you are going to rob me."

A. No.

Q. Did Theodore Cook at any time other than initially helping Roy Frye out of the Jeep vehicle ever grab, hold onto, or in any way restrain Roy Frye?

A. No.

Price's attorney indicated that, after answering these two questions, Price would invoke his fifth amendment privilege against self-incrimination and refuse to answer any further questions. In spite of the exculpatory and corroboratory nature of this testimony, the trial court sustained the prosecutor's objection to the calling of Price as a witness because the denial of cross-examination "would be unfair to the prosecution."

■ The trial court's ruling failed to take into account the extent to which the testimony of Price would have waived his privilege against self-incrimination. In *Brown v. United States*, 356 U.S. 148, 155–56, 78 S.Ct. 622, 626–27, 2 L.Ed.2d 589, 597 (1958), the Court noted:

> [W]hen a witness voluntarily testifies, the privilege against self-incrimination is amply respected without need of accepting testimony freed from the antiseptic test of the adversary process. The witness, himself, certainly if he is a party, determines the area of disclosure and therefore of inquiry. Such a witness has the choice, after weighing the advantage of the privilege against self-incrimination against the advantage of putting forward his version of the facts and his reliability as a witness, not to testify at all. He cannot reasonably claim that the Fifth Amendment gives him not only this choice but, if he elects to testify, an immunity from cross-examination on the

matters he has himself put in dispute. It would make of the Fifth Amendment not only a humane safeguard against judicially coerced self-disclosure but a positive invitation to mutilate the truth a party offers to tell. "[T]here is hardly justification for letting the defendant affirmatively resort to perjurious testimony in reliance on the Government's disability to challenge his credibility." *Walder v. United States*, 347 U.S. 62, 65, 74 S.Ct. 354, 356, 98 L.Ed. 503, 507 (1954). The interests of the other party and regard for the function of courts of justice to ascertain the truth become relevant, and prevail in the balance of considerations determining the scope and limits of the privilege against self-incrimination.

In analyzing the scope of the privilege against self-incrimination, this Court stated in *State v. Burton*, 163 W.Va. 40, 51–52, 254 S.E.2d 129, 137 (1979), that:

It is rather uniformly recognized that the privilege against self-incrimination extends not only to those questions which, if answered, would in themselves support a conviction, but also to those disclosures that might furnish a link in the chain of evidence or lead to evidence which could be used in the criminal prosecution. *Kastigar v. United States*, 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972); *In re Gault*, 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967); *Malloy v. Hogan*, 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964); *Hoffman v. United States*, 341 U.S. 479, 71 S.Ct. 814, 95 L.Ed. 1118 (1951).

Therefore, at least to the extent the testimony of Price would have established his presence at the time of Frye's alleged murder, it was the admission of an incriminating fact which would have waived the privilege against self-incrimination. A nonparty witness who voluntarily testifies as to an incriminating fact may be cross-examined concerning such fact as long as the answers sought do not tend to further incriminate. *See United States v. Seifert*, 648 F.2d 557, 561 (9th Cir.1980). For example, Price could have been cross-examined

concerning the appellant's activity while the truck was parked on the deserted road. *See Rogers v. United States*, 340 U.S. 367, 371, 71 S.Ct. 438, 440–41, 95 L.Ed. 344, 348 (1951) ["[T]he decisions of this Court are explicit in holding that the privilege against self-incrimination 'is solely for the benefit of the witness,' and 'is purely a personal privilege of the witness,' ... a refusal to answer cannot be justified by a desire to protect others from punishment...." (Footnotes omitted)]. Furthermore, the general rules with respect to the scope of cross-examination would have been applicable:

Several basic rules exist as to cross-examination of a witness. The first is that the scope of cross-examination is coextensive with, and limited by, the material evidence given on direct examination. The second is that a witness may also be cross-examined about matters affecting his credibility. The term "credibility" includes the interest and bias of the witness, inconsistent statements made by the witness and to a certain extent the witness' character. The third rule is that the trial judge has discretion as to the extent of cross-examination.

Syl. pt. 4, *State v. Richey*, 171 W.Va. 342, 298 S.E.2d 879 (1982).

We acknowledge the sensitive nature of the competing interests involved: the defendant's interest in presenting his or her own witnesses to establish a defense, the witness' interest in exercising his or her privilege against self-incrimination, and the prosecution's interest in securing effective cross-examination. Given the critical nature of each of these interests, however, the trial court was under a special obligation to seek an accommodation. In the instant proceeding, an in camera hearing would have been appropriate to determine the precise extent to which Price would have sought to invoke his privilege against self-incrimination. Perhaps, after he discovered that he would be directed to answer certain questions despite his invocation of the fifth amendment, he would have withdrawn his offer to testify. On the other hand, the prosecution might have discovered that he was willing to submit to

cross-examination as long as the answers sought did not tend to further incriminate him. In the absence of such an in camera hearing, however, we are left with no firm indication, other than the admittedly uncertain representations of Price's counsel, as to what the exact nature of Price's testimony would have been. Therefore, upon remand, if Price remains willing to testify, the trial court should conduct an in camera hearing to ascertain the exact nature of Price's testimony and to establish the parameters of appropriate cross-examination.

## VI

■ The appellant advances several assignments of instructional error. First, the appellant complains concerning the trial court's failure to instruct regarding lesser included offenses of murder. In *State v. Wayne*, 162 W.Va. 41, 46, 245 S.E.2d 838, 842 (1978), this Court upheld a trial judge's refusal to give instructions on lesser included offenses of felony murder, stating that:

> [T]he State's sole theory was a murder during an attempted robbery, which is first degree murder pursuant to *W.Va. Code*, 61–2–1 [1923]; and, the defense maintained the defendant did not kill Arthur Felder under any circumstances. Therefore, since the evidence only indicated first degree murder or complete innocence, the refusal of an instruction on lesser offenses was proper.

*See also State v. Bragg*, 160 W.Va. 455, 465, 235 S.E.2d 466, 472 (1977). This conforms with the general rule that, "Jury instructions on possible verdicts must only include those crimes for which substantial evidence has been presented upon which a jury might justifiably find the defendant guilty beyond a reasonable doubt." Syl. pt. 5, *State v. Demastus*, 165 W.Va. 572, 270 S.E.2d 649 (1980), *see also* Syl. pt. 14, *State v. Gum*, 172 W.Va. 534, 309 S.E.2d 32 (1983); Syl. pt. 2, *State v. Neider*, 170 W.Va. 662, 295 S.E.2d 902 (1982).

■ Second, the appellant protests the trial court's refusal to instruct regarding aggravated robbery and its lesser included offenses. He places particular emphasis on the separation of charges of first degree murder and aggravated robbery into two counts of his indictment. Although contained in two separate counts of a single indictment, however, the appellant clearly knew that he was being charged with felony murder by robbery, and not with first degree murder and aggravated robbery. In rejecting a contention that failure to mention the underlying felony in an indictment precludes conviction for felony murder, this Court in *State v. Young*, 173 W.Va. 1, 311 S.E.2d 118, 135 (1983), reaffirmed our holding in Syllabus Point 5 of *State v. Bragg, supra*, that:

> An indictment which charges that the defendant feloniously, wilfully, maliciously, deliberately, premeditatedly and unlawfully did slay, kill and murder is sufficient to support a conviction for murder committed in the commission of, or attempt to commit arson, rape, robbery or burglary, it not be necessary, under *W.Va. Code*, 61–2–1, to set forth the manner or means by which the death of the deceased was caused.

The inclusion of a charge of aggravated robbery in count two merely supplied the appellant with additional notice that he was being charged with felony murder. In Syllabus Point 1 of *State v. McGraw*, 140 W.Va. 547, 85 S.E.2d 849 (1955), this Court held that, "Immaterial, unnecessary and harmless averments, which might be omitted without affecting the charge in an indictment against the accused and which need not be proved, may be properly considered and rejected as surplusage." *See also* Syl. pt. 4, *State v. Hudson*, 157 W.Va. 939, 206 S.E.2d 415 (1974); Syl. pt. 3, *State ex rel. Cogar v. Haynes*, 154 W.Va. 805, 180 S.E.2d 492 (1971); *Pyles v. Boles*, 148 W.Va. 465, 135 S.E.2d 692 (1964). Clearly, count two of the appellant's indictment charging him with aggravated robbery, was unnecessary under *State v. Bragg, supra*, and, under Syllabus Point 8 of *State v. Williams*, 172 W.Va. 295, 305 S.E.2d 251 (1983), double jeopardy prohibited his punishment for both felony murder and aggravated robbery. Therefore, it did not entitle him to instructions on aggravated robbery

and its lesser included offenses as possible verdicts.

■ Finally, the appellant requests reconsideration of our holding in Syllabus Point 7 of *State v. Sims,* 162 W.Va. 212, 248 S.E.2d 834 (1978), that, "The crime of felony-murder in this State does not require proof of the elements of malice, premeditation or specific intent to kill. It is deemed sufficient if the homicide occurs accidentally during the commission of, or the attempt to commit, one of the enumerated felonies." This holding, however, has been reaffirmed in *State v. Wayne,* 169 W.Va. 785, 289 S.E.2d 480, 482 (1982); *State v. Hatfield,* 169 W.Va. 191, 286 S.E.2d 402, 408 n. 2 (1982); *State v. Taylor,* 168 W.Va. 380, 285 S.E.2d 635, 637 (1981); and, Syl. pt. 8, *State v. Grimmer,* 162 W.Va. 588, 251 S.E.2d 780 (1979), *overruled on other grounds, State v. Petry,* 166 W.Va. 153, 273 S.E.2d 346, 352 (1980), and, as we tersely noted in thinly disguised exasperation in *State v. Taylor,* 168 W.Va. at 384, 285 S.E.2d at 637: "Once again, the felony-murder rule codified in W.Va.Code, 61–2–1, is constitutional."

## VII

The appellant complains concerning certain remarks made by the prosecutor during closing argument. Specifically, he objects to references made to the possibility of parole within ten to twelve years if the jury returned a verdict of first degree murder with a recommendation of mercy. He correctly notes that, in Syllabus Point 1 of *State v. Lindsey,* 160 W.Va. 284, 233 S.E.2d 734 (1977), this Court held that, "It is the duty of the jury to determine the guilt or innocence of the accused in accordance with the evidence introduced at the trial and it must not concern itself with matters of possible parole or probation." *See also* Syl. pt. 4, *State v. Parks,* 161 W.Va. 511, 243 S.E.2d 848 (1978). This Court also held in Syllabus Point 3 of *Lindsey, supra,* however, that:

> In a case in which a jury may return a verdict of guilty of murder in the first degree, it is the mandatory duty of the trial court, without request, to instruct the jury that to such verdict it may add a

recommendation of mercy, that such recommendation would mean that the defendant could be eligible for parole consideration only after having served a minimum of ten years and that otherwise the defendant would be confined to the penitentiary for life without possibility of parole.

*See also* Syl. pt. 3, *State v. Kopa, supra;* Syl. pt. 4, *State v. Headley,* 168 W.Va. 138, 282 S.E.2d 872 (1981). Superficially, these two proportions seem contradictory. The critical distinction, however, is between the actual grant of parole and eligibility for parole consideration.

In *State v. Lindsey,* 160 W.Va. at 293, 233 S.E.2d at 739–40, this Court held that a trial court committed reversible error when it instructed a jury that if they recommended mercy the defendant would be "entitled" and "subject" to parole under the applicable statute, stating that, "It is quite possible, in fact probable, that the jury in the instant case would have recommended mercy had they not thought the defendant would then have been entitled to parole." Similarly, in *State v. Headley,* 168 W.Va. at 142, 282 S.E.2d at 875, we held that a trial court committed reversible error when it instructed the jury that if they recommended mercy the defendant would be "eligible" for parole, stating that, "While it was an accurate statement, this instruction was misleading because it gave the jury members, who are not presumed to have knowledge of the law, the impression that the appellant could go free immediately at the whim of the parole board."

■ In the instant case, the trial judge properly instructed the jury that if they recommended mercy the appellant "would be eligible for consideration for parole only after having served a minimum of ten (10) years of such sentence, such eligibility in no way guaranteeing immediate release." In Syllabus Point 3 of *State v. Boggs,* 103 W.Va. 641, 138 S.E. 321 (1927), this Court held that, "The discretion of the trial court in ruling on the propriety of argument by counsel before the jury will not be interfered with by the appellate court, unless it appears that the rights of

the complaining party have been prejudiced, or that manifest injustice resulted therefrom." *See also* Syl. pt. 9, *State v. Flint,* 171 W.Va. 676, 301 S.E.2d 765 (1983); Syl. pt. 2, *State v. Haddox,* 166 W.Va. 630, 276 S.E.2d 788 (1981); Syl. pt. 3, *State v. Curotz,* 142 W.Va. 45, 93 S.E.2d 519 (1956); Syl. pt. 1, *State v. Gory,* 142 W.Va. 5, 93 S.E.2d 494 (1956); Syl. pt. 10, *State v. Bail,* 140 W.Va. 680, 88 S.E.2d 634 (1955); Syl. pt. 7, *State v. Lewis,* 133 W.Va. 584, 57 S.E.2d 513 (1950); Syl. pt. 8, *State v. Reppert,* 132 W.Va. 675, 52 S.E.2d 820 (1949); Syl. pt. 2, *State v. Simon,* 132 W.Va. 322, 52 S.E.2d 725 (1949); Syl. pt. 6, *State v. Allen,* 45 W.Va. 65, 30 S.E. 209 (1898). Argument of the prosecution in this case was clearly limited to the appellant's eligibility for parole consideration and *possibility* of discharge in ten or twelve years, and, particularly in light of the court's instruction that eligibility for parole consideration in no way guaranteed immediate release, the trial court's refusal to grant appellant's motion for mistrial based upon the prosecutor's comments was not an abuse of discretion.

VIII

The appellant's final assignment of error is that the trial court erred by failing to direct a motion for directed verdict based upon the prosecution's failure to prove that intent to rob existed in the mind of the appellant before the striking of the fatal blows. In Syllabus Point 1 of *State v. Fisher,* 158 W.Va. 72, 211 S.E.2d 666 (1974), this Court held that:

Upon motion to direct a verdict for the defendant, the evidence is to be viewed in light most favorable to prosecution. It is not necessary in appraising its sufficiency that the trial court or reviewing court be convinced beyond a reasonable doubt of the guilt of the defendant; the question is whether there is substantial evidence upon which a jury might justifiably find the defendant guilty beyond a reasonable doubt.

*See also* Syl. pt. 1, *State v. Gum, supra;* Syl. pt. 4, *State v. Oldaker, supra;* Syl. pt. 1, *State v. Horton,* 170 W.Va. 395, 294 S.E.2d 248 (1982) Syl. pt. 5, *State v.*

*Woods, supra;* Syl. pt. 1, *State v. Johnson,* 159 W.Va. 682, 226 S.E.2d 442 (1976). Even excluding Richie's testimony that Frye muttered, "I think you are going to rob me," prior to exiting his truck, sufficient evidence was presented to establish a pre-existing intent to rob in the mind of the appellant. In Syllabus Point 2 of *State v. Wayne,* 169 W.Va. 785, 289 S.E.2d 480 this Court held that, "The felony-murder statute applies where the initial felony and the homicide are parts of one continuous transaction, and are closely related in point of time, place, and causal connection, as where the killing is done in flight from the scene of the crime to prevent detection or promote escape." Although this describes the classic felony murder situation of initial felony and subsequent homicide, it illustrates the importance of time, place, and causal connection. Frye's initial murder and subsequent robbery occurred within minutes, at the same location, and with no discernible break in the causal connection. Therefore, the trial court's refusal to direct a verdict for the appellant based upon the prosecution's failure to prove an intent to rob prior to Frye's homicide was not erroneous.

IX

In conclusion, due to the trial court's admission of evidence obtained pursuant to a warrantless search and seizure of the Cleveland hotel room after the appellant's arrest and its blanket refusal to permit the testimony of Mark Price, we must reverse his conviction and remand his case for retrial.

Reversed and remanded.

BROTHERTON, Justice dissenting:

Because I would have affirmed the decision of the trial court, I must dissent from the majority's holding in this case.

The majority reversed the conviction of Theodore Cook for two reasons: (1) the failure to exclude a checkbook obtained by a warrantless search and seizure, and (2) the refusal of the trial court to allow the testimony of Mark Price. The trial court was correct in both decisions.

Although the checkbook was seized pursuant to a warrantless search and seizure, it was nevertheless admissible because of the plain view exception. The police were alerted that Theodore Cook was in Cleveland because of Cook and his companion's use of the deceased's checkbook in financing their trip. Because of this the police were well aware of the importance of the checkbook as evidence. The police knew that the checkbook in this case could be as important evidence of a crime as a recently fired gun would be in another case. When the officers entered Cook's hotel room, pursuant to an arrest warrant, they almost immediately noticed the checkbook on the dresser. The checkbook was in plain view, the police had a legal right to be in the hotel room, and they had more than probable cause to believe that this would be important evidence in an upcoming criminal case. I believe this satisfies the requirements for a plain view exception. *See* syl. pt. 6 of majority opinion.

During his trial the appellant attempted to call Mark Price to the stand to answer two questions on direct. Price, an alleged accomplice in the murder, whose appeal of a murder conviction was pending at the time of the appellant's trial, had consented, against the advice of counsel, to answer two questions, as follows:

Question: While the jeep was parked at Hillcrest drive, at any time did Roy Frye say, "I think you are .going to rob me?"

Answer: No.

Question: Did Theodore Cook at any time other than initially helping Roy Frye out of the jeep vehicle ever grab, hold onto, or any way restrain Roy Frye?

Answer: No.

(R. 1205).

Price's attorney indicated that after answering these two questions Price would invoke his Fifth Amendment privilege against self incrimination and refuse to answer any further questions. The trial court sustained the prosecutor's objection to the calling of Price as a witness because the denial of cross-examination would be unfair to the prosecution. (R. 1210). The trial court was correct in its decision.

Cross examination is the fundamental test of the reliability of testimony in our system of justice.[1] In order for a witness to be competent to testify on direct, that witness must be subject to cross-examination. Even criminal defendants may be cross-examined as any other witness. W.Va.Code § 57–3–6 (1966). The State has a right to cross-examine all defense witnesses. A witness who refuses to be cross-examined should not be allowed to testify *See, e.g., People v. Carter,* 96 Mich.App. 694, 293 N.W.2d 681 (1980) (Defense witness who anticipated taking fifth amendment on cross-examination not allowed to testify.) If he has already testified and then refuses to answer pertinent questions in cross-examination, his direct testimony should be stricken. 5 Wigmore *Evidence* § 1391 (Chadbourn rev. 1974).

---

1. For two centuries past, the policy of the Anglo–American system of evidence has been to regard the necessity of testing by cross-examination as a vital feature of the law. The belief that no safeguard for testing the value of human statements is comparable to that furnished by cross-examination, the conviction that no statement (unless by special exception) should be used as testimony until it has been probed and sublimated by that test, has found increasing strength in lengthening experience.

Not even the abuses, the mishandlings, and the puerilities which are so often found associated with cross-examination have availed to nullify its value. It may be that in more than one sense it takes the place in our system which torture occupied in the medieval system of the civilians. Nevertheless, it is beyond any doubt the greatest legal engine ever invented for the discovery of truth.

. . . .

Striking illustrations of its power to expose inaccuracies and falsehoods are plentiful in our records; and it is apparent enough, in some of the great Continental trials, that the failures of justice could hardly have occurred under the practice of effective cross-examination. The special weakness of chancery procedure (which followed Continental traditions) lay in its obstacles to an effective cross-examination.

The praise of cross-examination and its efficacy as a fundamental test of truth have often been the subject of comment and exposition by our judges and jurists.

5 Wigmore *Evidence* § 1367 (Chadbourn rev. 1974).

The majority suggests that an *in camera* hearing would have been appropriate to determine the precise extent to which Price would testify. Although Price was not present, the court did conduct an *in camera* inquiry to the extent of Mr. Price's testimony. The inquiry clearly indicated that the witness would not subject himself to cross-examination. Mr. Snyder, attorney for the defendant, indicated that, "[Mark Price] will answer two very limited questions that I will ask him relating to a specific point in time during this entire event, that at that point he will answer no other questions from me or no other questions for the prosecution or no other questions for anybody and will invoke his fifth amendment privilege." (R. 1202). Mr. Snyder also indicated that, "the prosecution will probably not have, if things go according to the way they appear to be going, the opportunity to reasonably cross-examine this individual on any aspect of his testimony or any aspect of what interest or bias he might have in this case or anything." (R. 1203). Miss Haight, attorney for Mark Price, indicated that he was testifying against her advice and "after the discussion with him, it is also my prediction that after those two areas Mr. Price would attempt to invoke the fifth amendment, not to answer any other questions beyond matters pertaining to the two matters Mr. Snyder has already spoken to." (R. 1207). She also indicated that Mark Price would refuse to answer any other questions even if being threatened with contempt by the court. The prosecution in its argument noted that it indeed wanted to cross-examine Mr. Price as they would any other witness and drew attention to the particular difficulties with this witness. "In this particular defendant's position the court has no hammer to make him testify. If the court were to order him to testify, this man already having been sentenced to life in prison without mercy, thirty days—or in jail if he perjures himself—is a big joke to him." (R. 1210). The court, exercising its discretion, refused to allow Mark Price to testify, basing its ruling heavily on Mark Price's attorney's predictions:

Well, I heard Miss Haight, and I have great confidence in Miss Haight, not only in her ability but I have confidence in her integrity and it's Miss Haight's opinion that—although she didn't say it—if I threatened him with contempt of court if he didn't speak up, it was Miss Haight's opinion that he would become recalcitrant and not cooperate. So I am going to sustain your objection Mr. Brown. (R. 1210).

The scope of cross-examination is clearly a matter within the discretion of the trial judge. *Evidence in Virginia and West Virginia* § 30 (1954). It may have been possible, however unlikely given these facts, for a compromise to have been reached between the defendant's interest in getting this evidence in and the prosecution's right of cross-examination.

Unquestionably, such a compromise should be encouraged. The question before the Court, however, is who should bear the burden of proposing such a compromise. The majority opinion at page 16 appears to put this obligation upon the trial court: "Given the critical nature of each of these interests, however, *the trial court was under a special obligation* to seek an accommodation." (Emphasis added.) The burden should not be on the trial judge to propose such a compromise. He did not talk to the witnesses and is unfamiliar with what they may testify to. Also, he is totally unaware of the special tactical problems that the defense may have. In this case it is probable that the defense did not want Mark Price as a witness if he was subject to cross-examination. Mr. Price was also accused of the murder. He would have been defending his own neck. If forced to further testify, he may well have accused Cook of delivering the fatal blow. Therefore, the judge's efforts in trying to effect a compromise would have probably been futile.

A rule which requires the defense to proffer a suggestion of compromise would be subject to a more effective review upon appeal. This Court would have a record showing the compromise offer and the arguments in support thereof and objections

thereto along with the judge's ruling. In the present case we are totally in the dark as to what possible compromises there may have been, if any.

For the above reasons, I would have affirmed the decision of the trial court.