407 S.E.2d 365

**STATE of West Virginia, Plaintiff Below, Appellee,**

v.

**Jeffrey A. WARD, Defendant Below, Appellant.**

**No. 19704.**

Supreme Court of Appeals of West Virginia.

Submitted Jan. 9, 1991.

Decided May 9, 1991.

Dissenting Opinion of Chief Justice Miller Aug. 15, 1991.

James M. Cagle, Charleston, for appellant.

Roger W. Tompkins, Atty. Gen., Joanna I. Tabit, Sr. Asst. Atty. Gen., Charleston, for appellee.

BROTHERTON, Justice:

On December 12, 1985, the appellant, Jeffrey Ward, was found guilty of daytime burglary by entering without breaking into the home of his mother, Mrs. Crete Ward, on or about May 13, 1984. Sentencing was delayed until April 28, 1989, when Ward was ordered to serve one to ten years in the State Penitentiary at Moundsville, West Virginia. The sentence was suspended and Ward was placed on two years probation. However, he was subsequently ordered to serve four months in the Wayne County Jail as a term and condition of his probation. Ward's appeal is based primarily on his assertion that there is insufficient evidence to sustain his conviction, although he makes several additional assignments of error which we will briefly discuss.

On May 11, 1984, Mrs. Crete Ward was hospitalized for eleven days after she severely cut her foot while mowing her lawn. The daytime burglary which is the subject of this appeal allegedly occurred at some point during her hospitalization. Several days after returning home, Mrs. Ward discovered that a diamond ring, a safety deposit box key, and her will were missing from her bedroom. After visiting the bank in which the safety deposit box was located, Mrs. Ward called the police to report a burglary.

At trial, Mrs. Ward testified that she had just received her new will two or three days before her hospitalization and placed it on her desk. Jeffrey Ward was not a beneficiary under the terms of the new will, but he would inherit his mother's estate if she died without a will. The prosecution suggested that Jeffrey was the only party who stood to benefit from the theft of the will and noted that the will was stolen at a time when Mrs. Ward was in a precarious medical condition.

Neither Mrs. Ward's will nor her diamond ring were ever recovered. However, evidence introduced at trial showed that Jeffrey Ward went to the bank, signed a card, and entered the safety deposit box on May 14 and May 16, 1984.[1] The issue of whether the key he used to enter the box was the key taken from Mrs. Ward's home was a question of fact to be resolved at trial.

Ward's first assignment of error relates to the sufficiency of the evidence which was used to convict him. Specifically, Ward argues that he was entitled to a directed verdict of acquittal because the State failed to establish a prima facie case of daytime burglary. The elements of the

---

1. In 1981, Jeffrey Ward's name was placed on a signature card which permitted him access to the safety deposit box. Two keys may have been issued to Mr. and Mrs. Ward in 1959, but Mrs. Ward testified that she only remembered them having one key. Jeffrey Ward maintains that his father gave him a key.

Mrs. Ward stated that she told Jeffrey his name could be added to the signature card because "I was beginning to get old, and the time might come when he needed to have some money." The safety deposit box contained an undetermined amount of valuable old coins, $1,000 in cash, and a $10,000 certificate of deposit from the First Bank of Ceredo. In a subsequent civil proceeding, Mrs. Ward sought to recover the $10,000 certificate of deposit, as well as the monies contained in two savings accounts at Huntington Federal Savings & Loan Association, which she alleged that Ward had converted to his own use, to the exclusion of her ownership interest, on or about May 14, 1984. The court found that Ward was in possession of the proceeds of the accounts and the certificate of deposit. He was permitted to retain possession of the proceeds of one account in the amount of $6,542.84. However, Mrs. Ward received a judgment against Jeffrey Ward for $14,775.96, representing the amount of the certificate of deposit and the proceeds of the second savings account at Huntington Federal Savings & Loan Association.

crime are delineated in W.Va.Code § 61–3–11(b) (1989), which states that:

> If any person shall, in the daytime, enter without breaking a dwelling house, or an outhouse adjoining thereto or occupied therewith, of another, with intent to commit a felony or any larceny therein, he shall be deemed guilty of a felony, and, upon conviction, shall be confined in the penitentiary not less than one nor more than ten years.

Ward states that just a single witness placed him outside of his mother's home during the daytime on May 14 or 15, 1984, and he argues that a jury could not reasonably infer his presence inside the dwelling from his presence outside the milkhouse, which is 200 to 250 feet away from Mrs. Ward's home.

The general test for reviewing the sufficiency of the evidence in a criminal proceeding has been stated by this Court as follows:

> In a criminal case, a verdict of guilt will not be set aside on the ground that it is contrary to the evidence, where the State's evidence is sufficient to convince impartial minds of the guilt of the defendant beyond a reasonable doubt. The evidence is to be viewed in the light most favorable to the prosecution. To warrant interference with a verdict of guilt on the ground of insufficiency of evidence, the court must be convinced that the evidence was manifestly inadequate and that consequent injustice has been done.

Syl. pt. 2, *State v. Craft*, 165 W.Va. 741, 272 S.E.2d 46 (1980). In *Craft*, this Court affirmed a breaking and entering conviction although there were no witnesses to the crime and no evidence discovered at the scene which linked the defendant to the crime. *Id.*, 165 W.Va. at 750, 272 S.E.2d at 49. However, the defendant was observed at the scene a few hours before the burglary occurred and was carrying a valise which it was later determined contained tools taken during the burglary. Another stolen tool was located in the trunk of the defendant's car. *Id.*, 165 W.Va. at 748, 272 S.E.2d at 50. In affirming the conviction in *Craft*, we noted that exclusive possession of stolen property is not prima facie evidence that the person is the thief, but that "such possession is, nevertheless, a strong circumstance to be considered with other evidence, facts and circumstances properly tending to prove the guilt of such person." Syl. pt. 1, *State v. Etchell*, 147 W.Va. 338, 127 S.E.2d 609 (1962).

In the case now before us, a ring, a will, and a safety deposit box key were taken from Mrs. Ward's home. The State points out that Mrs. Ward took care to assure that her home was locked up before going to the hospital. She gave her house and car keys to the neighbor who drove her to the hospital, Rick Stephenson, and asked him to keep them for her. While waiting at the hospital, Jeffrey Ward asked Stephenson for the keys, and Stephenson handed the keys to Ward's wife, Natalie. Later, Ward refused to give the keys to his mother when she demanded their return. Mrs. Ward maintains that she never gave her son permission to use the keys to enter her home. However, he was seen at her home during a time when the theft could have occurred. Although there was no testimony at trial which placed Ward inside his mother's home during her hospitalization, Stephenson testified that he saw Ward outside the house and then heard a door slam. However, Stephenson was not certain whether the door which slammed was the door to the main house or the smaller milkhouse.

Most significantly, there is the uncontroverted evidence that although he had never done so before, Ward entered the safety deposit box on two separate occasions during his mother's hospitalization. Crete Ward testified that she never gave Jeffrey a key to the box, nor were any duplicates made, and she never gave him permission to use her key. While Ward maintains that the key he used was his own key and that he had a right to enter the box, this is an issue which is properly resolved by the jury.[2] As we stated in *Craft:*

**2.** Ward also argues that because the circuit court granted partial summary judgment for

both him and his mother in an action she instituted to recover the contents of the safety depos-

"Evidence of the exclusive possession by ... accused person of recently stolen goods, corroborated by other proper evidence, facts and circumstances tending to prove guilt, may be sufficient to convict the possessor of the theft of such goods, even though the corroborating evidence, facts and circumstances alone would be insufficient to support a conviction. Whether, in such circumstances, the evidence is sufficient to establish the guilt of the accused beyond reasonable doubt is ordinarily a question of fact for the jury." Syllabus Point 2, *State v. Etchell*, 147 W.Va. 338, 127 S.E.2d 609 (1962).

*Id.* at syl. pt. 4. In reviewing the sufficiency of the evidence upon a motion for a directed verdict, this Court has noted that "[i]t is not necessary in appraising its sufficiency that the trial court or reviewing court be convinced beyond a reasonable doubt of the guilt of the defendant; the question is whether there is substantial evidence upon which a jury might justifiably find the defendant guilty beyond a reasonable doubt." Syl. pt. 4, in part, *State v. Johnson*, 159 W.Va. 682, 226 S.E.2d 442 (1976). Under the circumstances of this case, we find that there was sufficient evidence presented for the jury to conclude that Ward was guilty of daytime burglary.

■ In his second assignment of error, Ward argues that the trial court's *sua sponte* declaration of a mistrial after his first trial began barred the second trial, because it violated his constitutional guarantee against double jeopardy. During the first trial, after the jury was sworn and the State called its first witness, one of the jurors suddenly announced to the court that he realized he knew the defendant's wife, Natalie. In response to the judge's questions, the juror, Paul Clevenger, said, "... honestly, I don't think I would be influenced, but I thought I should tell the court...." Thereafter, the jury was sent to the jury room. Several minutes later, Mr. Clevenger left the jury room because he had something more to tell the judge. The judge, the prosecutor, defense counsel, and the juror went back into chambers, where Mr. Clevenger told the judge that he would "rather not be on the jury ... I really don't think it would be fair for me to be on the jury." The judge then returned to the courtroom and announced that he was "forced to declare a mistrial" and continue the case until the next term of court.

Ward asserts that the second trial violated double jeopardy principles because the trial court failed to consider alternatives to declaring a mistrial and there was no "manifest necessity" which warranted the court's declaration of a mistrial. While maintaining that the issue was waived by the appellant on appeal, the State argues that the decision to grant a mistrial is always within the discretion of the trial court.

" 'The power of a court in a criminal case to discharge a jury without rendering a verdict is discretionary.' Syllabus Point 2, in part, *State ex rel. Brooks v. Worrell*, 156 W.Va. 8, 190 S.E.2d 474 (1972)." Syllabus point 6, *State v. Oldaker*, 172 W.Va. 258, 304 S.E.2d 843 (1983). West Virginia Code § 62–3–7 (1989) provides that:

> If a juror, after he is sworn, be unable, from any cause, to perform his duty, the court may, in its discretion, cause another qualified juror to be sworn in his place. And in any criminal case the court may discharge the jury, when it appears that they cannot agree in a verdict, or that there is manifest necessity for such discharge.

" 'Termination of a criminal trial arising from a manifest necessity will not result in double jeopardy barring a retrial.' Syl. Pt. 4, *Keller v. Ferguson*, 177 W.Va. 616, 355 S.E.2d 405 (1987)." Syllabus point 2, *State v. Gibson*, 181 W.Va. 747, 384 S.E.2d 358 (1989). This Court has defined the phrase

---

it box, no larcenous intent could have existed on his part. We reject this argument, however, because that civil proceeding was distinct and separate from the burglary case now before us. The criminal trial dealt only with Ward's alleged taking of the will, ring, and safety deposit box key. The matter of who was entitled to receive certain *contents* of the safety deposit box was resolved in the civil proceeding.

"manifest necessity" as one which "covers a broad spectrum of situations which in some instances bear little relationship to the literal meaning of this phrase." *Keller*, 177 W.Va. at 620, 355 S.E.2d at 409.

Where the circumstances which force a trial court to declare a mistrial are unforeseeable and make the completion of the trial impossible, "a manifest necessity will be found to exist and double jeopardy will not be found to bar retrial." *State v. Gibson*, 181 W.Va. 747, 384 S.E.2d 358, 361 (1989). In *Gibson*, the trial court *sua sponte* declared a mistrial when a juror failed to appear for the second day of trial and no alternate jurors had been impanelled. Citing *State v. Little*, 120 W.Va. 213, 197 S.E. 626 (1938), the defendant in *Gibson* argued that the failure to select an alternate juror was within the control of the trial court and, therefore, a manifest necessity should not be found to exist. *Gibson*, 181 W.Va. at 751, 384 S.E.2d at 362. In *Little*, a mistrial was declared at the State's request and over the defendant's objection when witnesses failed to return to court at the appropriate time. On appeal, the Court found that the State did not carry its burden in justifying the discharge of the jury and, therefore, the defendant could not be retried due to double jeopardy. *Little*, 120 W.Va. at 214, 197 S.E. at 627.

Like *Gibson*, the case now before us is distinguishable from *Little* by the fact that the trial court declared a mistrial *sua sponte* without objection from either the prosecution or the defense. Moreover, twelve jurors were impanelled and no alternate jurors were selected. "No mandatory duty is placed upon the trial court to select alternate jurors." *Gibson*, 181 W.Va. at 751, 384 S.E.2d at 362. As we noted above, a trial court's decision to discharge a jury before it renders a verdict is a discretionary act which will only be reversed for abuse of discretion. We find no abuse of discretion by the trial court in this case.

Next, Ward argues that his absence from certain trial proceedings on three separate occasions constitutes plain and reversible error. The first occurred in chambers on November 28, 1984, during the individual voir dire of the juror whose disqualification necessitated the mistrial. However, because we have upheld the trial court's declaration of a mistrial, any errors allegedly committed during that trial are not now before this Court on appeal. The second absence cited by Ward occurred during the second trial on December 12, 1985, when Ward's attorney was present for a discussion in chambers between the judge and the prosecution. Finally, neither Ward nor his attorney were present when the judge ruled on the prosecuting attorney's motion to be removed from the case.

In *State ex rel. Grob v. Blair*, 158 W.Va. 647, 214 S.E.2d 330, 338 (1975), this Court held that presence is a right of the accused at any "critical stage in the criminal proceeding." We subsequently reaffirmed this right in *State v. Boyd*, 160 W.Va. 234, 233 S.E.2d 710, 719 (1977), and concluded that "a critical stage in the criminal proceeding is one where the defendant's right to a fair trial will be affected." We reiterated the rule of harmless constitutional error in *Grob* [3] and held that before a defendant's absence at a critical stage will be deemed reversible error, "he must demonstrate a possibility of prejudice in the occurrence." *Id.*, 158 W.Va. at 659, 214 S.E.2d at 337. However, we restated this rule in *Boyd* and held that "where the State defends against the claim that a right guaranteed by our Constitution has been violated, on the basis that the violation is harmless error, it is incumbent on the State to show that the error was harmless beyond a reasonable doubt." *Boyd*, 160 W.Va. at 245, 233 S.E.2d at 718.

"Generally, all matters starting with the commencement of the actual trial require the presence of the accused through final judgment." *Id.*, 160 W.Va. at 246–247, 233 S.E.2d at 719. In this case, the State maintains that the defendant's absences oc-

---

**3.** "[T]he test for harmless constitutional error, promulgated by the United States Supreme Court, is whether the apparent error did not, beyond a reasonable doubt, prejudice the ac-

cused at trial." *Grob*, 158 W.Va. at 659, 214 S.E.2d at 337; *see also State v. Thomas*, 157 W.Va. 640, 203 S.E.2d 445 (1974).

curred during non-critical stages of the proceedings and constitute harmless error.

■ It is not apparent from the record exactly what the judge said to counsel in the defendant's absence during the second trial on December 12, 1985. We note that counsel was called into chambers after Ward's attorney objected to the scope of the prosecutor's redirect examination of Trooper R.L. McAlister, who investigated the alleged burglary. Ward was present in the courtroom when the judge stated, "I'll see both you counsel in chambers." However, Ward did not choose to participate in this brief discussion and does not suggest that something happened which affected the outcome of the trial or prejudiced his rights in any manner. While the brief exchange between the trial court judge and counsel for both the prosecution and the defense might be considered a "critical stage" in the proceedings, we cannot conclude that Ward's failure to be present amounts to anything more than harmless error.

■ Finally, defense counsel was aware of the prosecuting attorney's motion to withdraw from the case, but chose not to attend a hearing on this issue which was scheduled on November 8, 1984. Because this motion did not involve either a substantial matter of law or the testimony of witnesses, we do not consider this collateral proceeding to be a "critical stage" or "a part of the trial requiring the presence of the defendant." *Grob*, 158 W.Va. at 662, 214 S.E.2d at 339. We find no reversible error on this point.

■ The prosecutor's motion to withdraw prior to trial also forms the basis of Ward's fourth and fifth assignments of error. Ward argues that because Prosecuting Attorney Robert Chafin sought to disqualify himself from participation in the trial of the case, he should have been disqualified from participating in the initial grand jury proceedings which resulted in Ward's indictment for those very same reasons.[4] On October 9, 1984, Chafin moved that he and his staff be permitted to withdraw from representing the State in the Ward prosecution "for reasons to be later assigned in argument." The court granted the motion by order dated November 8, 1984, for reasons "assigned and stated to the Court."

In addition to questioning Chafin's involvement in the grand jury proceedings, Ward argues that the subsequent prosecution of his case by Special Prosecutor Mark Garren violated his constitutional right to due process because he was entitled to "a disinterested prosecutor ... free from even the appearance of a conflict of interest." According to Ward, Garren worked in the office of the attorney whom he contacted when he initially sought counsel regarding the difficulties he was having with his mother. For this reason, Ward maintains that Garren's prosecution of his case was improper.

However, the State argues that Ward waived any objection to Chafin's handling of the indictment, as well as Garren's prosecution of the case, and we agree. As we discussed above, Ward did not attend the hearing on Chafin's motion to withdraw as prosecutor in the case. Moreover, he failed to raise this issue before either of his trials. In fact, Ward did not object either to Chafin's role prior to the indictment or to Mark Garren's appointment as Special Prosecutor until February 3, 1989, when he filed his Supplemental Motion to Award a New Trial. Rule 12(b)(1) of the West Virginia Rules of Criminal Procedure states that defenses and objections based on defects in the institution of the prosecution must be raised prior to trial.

4. The problems herein apparently occurred because it was Mrs. Ward who initiated contact with Robert Chafin when he was the prosecuting attorney in Wayne County. Mrs. Ward consulted with Chafin about the allegations which resulted in Ward's indictment, as well as "other things that [she] needed to know." The relationship between Mrs. Ward and her son was strained for approximately six months to a year before the daytime burglary allegedly took place. During this period of time, Mrs. Ward and Jeffrey both contacted private attorneys about their differences. At one point, Mrs. Ward filed a complaint and asked Jeffrey and his wife to move out of her home. They did move out, and the complaint was dismissed for failure to prosecute.

■ Ward's final two assignments of error relate to sentencing. First, Ward argues that the sentencing delay was inordinate, oppressive and purposeful, in violation of Rule 32 of the West Virginia Rules of Criminal Procedure, which requires that sentencing proceed "without unreasonable delay." Ward was convicted on December 12, 1985, but was not sentenced until April 28, 1989. However, the State suggests that Ward himself was the primary cause of the delay.

At a hearing on April 28, 1989, both parties agreed that July, 1986, was the earliest time at which Ward could have been sentenced. The first presentence report was filed on April 1, 1986, after which Ward's trial counsel withdrew from his case. On April 29, 1986, Ward filed a motion seeking Judge C.W. Ferguson's recusal from the case because his son was the probation officer who prepared the presentence report. On May 20, 1986, Judge Ferguson denied the motion, but ordered that his son be recused, which necessitated that another presentence investigation be completed. This report was filed on July 7, 1986. Sentencing was set for January 26, 1987, but was postponed at the request of Ward's counsel, who asked for a continuance beyond February 2, 1987. It was not until November 11, 1988, that Judge Alfred Ferguson was appointed to handle the disposition of this case. Ward once again moved for a new trial on December 1, 1988. Following the filing of supplemental motions, Ward was sentenced on April 28, 1989.

In the syllabus of *Ball v. Whyte*, 170 W.Va. 417, 294 S.E.2d 270, 271 (1982), this Court stated that, "[s]entence shall be imposed without unreasonable delay; however, the passage of time alone will not bar imposition of sentence or require a defendant's discharge. Delay must not be purposeful or oppressive; deprivation of rights depends upon the particular circumstances of each case." In this case, we find no evidence of either purposeful or oppressive delay on the part of the State. Indeed, much of the delay to which we can assign fault was caused by Ward himself.

The record is silent as to what occasioned the delay from February 2, 1987, until November 11, 1988. However, Ward argues that a purpose behind the delay was reflected in a note Probation Officer Jamie Ferguson sent to then Judge C.W. Ferguson which stated that, "Court's opinion is to impose sentence unless C.D.'s are returned." The C.D.'s in question were certificates of deposit Jeffrey Ward had taken from the safety deposit box which were the subject of a civil action filed by Mrs. Ward in 1986. Ward argues that the circuit court used the threat of incarceration to obtain the desired result in the civil suit. Ward maintains that the State delayed sentencing him while the civil suit proceeded because the State knew "that the treatment as a felony of a matter seemingly civil in nature was too severe."

The State effectively counters this argument by pointing out that Ward's sentencing was initially set for April 1, 1986, but was delayed for reasons not reflected in the record. Mrs. Ward did not file the civil action against her son until July 22, 1986. Thereafter, sentencing was scheduled for January 16, 1987, but was postponed because of conflicts in defense counsel's schedule. We agree with the State's conclusion that there is no evidence that the trial court attempted to delay sentencing because the civil action was pending.

■ Finally, Ward argues that his sentence of four months in the Wayne County Jail is void because W.Va.Code § 61-3-11(b) (1989) states that a person found guilty of daytime burglary "shall be confined in the penitentiary not less than one nor more than ten years." Ward states that there is no option to sentence an offender to the county jail, and thus his sentence is void.

Ward is incorrect, however, because his four-month jail sentence was termed a condition of the two years' probation he received when his sentence was suspended. West Virginia Code § 62-12-9(4) (1989) provides that, as a condition of probation, a court may require a probationer "to serve a period of confinement in the county jail of the county in which he was convicted for a

period not to exceed one third of the minimum sentence established by law or one third of the least possible period of confinement in an indeterminate sentence, but in no case shall such period of confinement exceed six consecutive months." Ward's sentence of four months' confinement in the Wayne County Jail was for a period constituting one third of the minimum sentence established by law, which, in this case, was one year.

We find no grounds for reversal in the errors assigned by the appellant in this case. Therefore, the April 28, 1989, order of the Circuit Court of Wayne County is affirmed.

Affirmed.

MILLER, C.J., dissents and reserves the right to file a dissenting opinion.

MILLER, Chief Justice, dissenting:

My dissatisfaction with the majority rests on its discussion of the double jeopardy principles presented by this case.[1] The defendant's double jeopardy claim was grounded on two points: first, that there was no showing of a manifest necessity for the judge to declare a mistrial because of the juror's ambiguous remarks, and second, that there was no meaningful effort to explore reasonable alternatives to the mistrial. These are two central tenets of our double jeopardy law. *See Keller v. Ferguson*, 177 W.Va. 616, 355 S.E.2d 405 (1987); *Porter v. Ferguson*, 174 W.Va. 253, 324 S.E.2d 397 (1984). We explained these principles in *State ex rel. Betts v. Scott*, 165 W.Va. 73, 79, 267 S.E.2d 173, 177 (1980), where we defined manifest necessity as an event "which arises from circumstances not within the control of the prosecution or the court" and went on to state:

"[B]efore a midtrial break on manifest necessity grounds will be upheld, it must be shown that the trial court explored reasonable alternatives to a mistrial before granting it. *See Arizona v. Wash-*

ington, [434 U.S. 497, 98 S.Ct. 824, 54 L.Ed.2d 717 (1978)]; *United States v. Jorn*, 400 U.S. 470, 91 S.Ct. 547, 27 L.Ed.2d 543 (1971) (plurality opinion); *Harris v. Young*, 607 F.2d 1081, 1085 (4th Cir.1979), *cert. denied*, 444 U.S. 1025, 100 S.Ct. 688, 62 L.Ed.2d 659 [(1980)]." 165 W.Va. at 79, 267 S.E.2d at 177.

The majority's recitation of the remarks of juror Clevenger and the judge are not complete. There is no question that the incident arose after the jury had been empaneled and sworn, opening statements had been made, and the first witness had been called.[2] At this point, the juror, Mr. Clevenger, stated in open court that he knew the defendant's wife when she was in high school, but had not seen her in years. The court then asked the juror if this would prevent him from reaching a fair and impartial verdict. The juror replied he did not think he would be influenced and added that he had never heard anything about the case.

The record reveals that the court then asked counsel to approach the bench and an off-the-record discussion occurred. The juror was then invited back to the judge's chambers along with the attorneys. There, the juror apologized for bringing the matter up and then stated somewhat contrary to his initial remark that the defendant's wife "was a friend of my children." The court then asked the juror if he was absolutely sure that he could be fair and impartial. The juror replied that he would rather not be on the jury.

The judge then repeated the question as to whether he could be fair and impartial, to which the juror replied, "I really don't think it would be fair for me to be on the jury." At this point, the judge responded: "That's all I need to know." The juror was then excused, and the entire panel was discharged.

---

1. The majority has bypassed the State's argument that the double jeopardy claim was waived by the failure to assert it during the second trial. Consequently, I express no view on this issue.

2. We have traditionally recognized that double jeopardy will attach when the jury is empaneled and sworn. *Porter v. Ferguson*, 174 W.Va. 253,

I do not believe that under this set of facts there was any manifest necessity. We have traditionally held that the mere acquaintance on the part of a juror with a witness is not grounds for disqualification of a juror. *State v. Storey,* 182 W.Va. 328, 387 S.E.2d 563 (1989); *State v. White,* 171 W.Va. 658, 301 S.E.2d 615 (1983). Moreover, the juror's answers to the court's inquiries were not responsive as to whether he could fairly and impartially listen to the evidence. The juror's replies were couched in terms that he would rather not sit or that he did not think it was fair for him to sit.

It is apparent from the limited information given by the juror that his friendship with the defendant's wife was tenuous at best. She had gone to high school with his children and he had not seen her for a number of years. Thus, there was little objective evidence pointing to any bias.

The judge's failure to probe the facts more deeply and to require the juror to answer specifically the question of his ability to be impartial points to the fact that there was no meaningful effort to find that the juror was in fact disqualified.

The judge would not have been prohibited from advising the juror that under the law the removal of a juror after the jury has been empaneled and sworn can be done only for the most serious cause. The juror should have been advised that mere acquaintance with the defendant's wife is not sufficient reason and that only if the juror entertained a bona fide reason for being unable to fairly and impartially hear the case could he be excused.

The majority's failure to discuss these factors results in its rather shallow conclusion that "a trial court's decision to discharge a jury before it renders a verdict is a discretionary act which will only be reversed for abuse of discretion." 185 W.Va. at 366, 407 S.E.2d at 370. This completely misses the jeopardy test for awarding a mistrial *sua sponte* on the court's part.

Several other jurisdictions have confronted an analogous problem and have uniformly held that the trial court's declaration of a mistrial when it failed to probe a

324 S.E.2d 397 (1984); *Adkins v. Leverette,* 164

juror's revelation of a potential disqualification after the jury had been empaneled and sworn resulted in a double jeopardy bar. The Supreme Court of California in *Larios v. Superior Court of Ventura County,* 24 Cal.3d 324, 155 Cal.Rptr. 374, 594 P.2d 491 (1979), had a more egregious situation where one of the jurors during a recess of the trial had made an independent investigation of some of the facts testified to at trial. This fact was disclosed to the trial judge, who then questioned the jury. After identification of the juror who had made the investigation, the court held a hearing outside the presence of the other jurors. The juror indicated that the information he had obtained might affect his ability to judge the case fairly. He also added that he did not think it would be fair to the defendant for him to use the information he had obtained. The trial court declared a mistrial and, when the State attempted a retrial, the defendant sought a prohibition on double jeopardy grounds.

The court in *Larios* pointed out several critical factors. First, the defendant did not agree to the mistrial. Second, it noted that the record disclosed that the juror had not revealed the results of his independent investigation to the other jurors, and thus, the entire panel was not infected. Finally, it made this distinction between what might be good cause to remove a juror and the higher standard of a legal or manifest necessity under jeopardy principles:

"A juror's misconduct has a different effect. Absent a valid objection to the juror's continuing to serve, a full jury remains. The fact that a juror's actions or beliefs would provide 'good cause' for his replacement if an alternate were available does not mean that there is 'legal necessity' for a mistrial where no alternate is available. (See *People v. Davis* (1972) 27 Cal.App.3d 115, 120, 103 Cal.Rptr. 494.)" 24 Cal.3d at 332, 155 Cal.Rptr. at 378, 594 P.2d at 495.

The trial court in *People v. Anglin,* 6 Mich.App. 666, 150 N.W.2d 532 (1967), was confronted during the trial with a juror who was recently discovered to be the brother-in-law of the county sheriff. When

W.Va. 377, 264 S.E.2d 154 (1980).

the defendant agreed to an eleven-person jury but refused a stipulation that the jury not be told the reason for dismissal of the twelfth juror, the court declared a mistrial. The appellate court, in holding a double jeopardy bar, pointed out: "Here the record does not disclose any investigation on the part of the trial court to determine whether or not the juror was prejudiced so as to be disqualified." 6 Mich.App. at 677, 150 N.W.2d at 537.

Finally, in *Schaffer v. State,* 649 S.W.2d 637 (Tex.Crim.App.1983) (en banc), after the jury was empaneled and sworn, the judge *sua sponte* declared a mistrial as a result of the disqualification of a juror. There was nothing formalized in the record, but it appears from trial counsel's representation that the judge had learned that one of the jurors had a conversation with a third party and had possibly formed an opinion about the case. In holding no manifest necessity to have been shown, the appellate court commented on the lack of findings and explanation by the trial court to warrant a finding of manifest necessity, as well as the lack of exploration of other reasonable alternatives to a mistrial. *See generally* Annot. 40 A.L.R.4th 741 (1985).

Here, as I have earlier indicated, the trial court made no attempt to ascertain if the juror had any objective reason for claiming a disqualification. The court did not acquaint the juror with the seriousness of the situation nor require that he answer questions regarding whether he could impartially hear the evidence. In light of the tenuous relationship between the juror and the defendant's wife, the trial court would have been justified in advising the juror that he was not disqualified. Finally, the court made no attempt to ascertain if the defendant would accept a panel of eleven or agree to the mistrial.

In sum, there was nothing done on the part of the trial court to meet the double jeopardy manifest necessity test. There was no showing of a manifest necessity initially in order to consider declaring a mistrial. Additionally, the trial court took no steps to explore reasonable alternatives to a mistrial as is required under double jeopardy principles. For the majority to hold otherwise is to exhibit a serious misunderstanding of our double jeopardy law.